UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Mark Zell, and Beth Zell, individually and on behalf of K.Z., a minor,<br><br>*Plaintiff,*<br><br>     v.<br><br>BARRY RICCI, alias, Superintendent of Chariho Regional School District in his individual and official capacities, CHARIHO REGIONAL SCHOOL DISTRICT, by and through its Superintendent, Barry Ricci, alias, RYAN BRIDGHAM, alias, Dean of Students Chariho High School, in his individual and official capacities, LAURIE WEBER, alias, Former Principal of Chariho High School in her individual and official capacities, JON ANDERSON Esq., alias, Chariho Regional School District Attorney in his official capacity, THE CHARIHO SCHOOL COMMITTEE, by and through its Chairperson, Sylvia Stanley, alias, in her official capacity, CRAIG LOUZON, alias, in his individual and official capacity as the former Chair of the Chariho School Committee, RACHEL MCGINLEY, alias, in her individual capacity, THE RHODE ISLAND DEPARTMENT OF EDUCATION, by and through its Commissioner, Ken Wagner, alias, KEN WAGNER, alias, in his official and individual capacity, THE RHODE ISLAND COUNCIL OF ELEMENTARY AND SECONDARY EDUCATION, by and through its Chair Barbara Cottam, alias, BARBARA COTTAM, alias, in her individual and official capacity,  JOHN/JANE DOES 1-20, and JOHN DOE GOVERNMENT ENTITIES/BODIES 1-10,<br><br>*Defendants.* | CA No:<br><br>PLAINTIFF DEMANDS TRIAL BY JURY |

## COMPLAINT

This action is commenced by Plaintiffs against all Defendants for a long series of violations of law and Plaintiffs' Constitutional and common law rights, originating with an assault and torts committed against the minor Plaintiff K.Z, then leading to the Defendant School District and defendants perpetuating Constitutional Conspiracy, Due Process violations, disability-based

1

discrimination by failure to accommodate, and several torts resulting in deprivations, harms and injuries to all Plaintiffs.

## PARTIES

1. K.Z. (hereinafter "Plaintiff K.Z." or "K.Z."), is a minor that graduated from Chariho High School (hereinafter "CHD") who is a resident of the Village of Saunderstown in the towns of Narragansett and North Kingstown, in the County of Washington, State of Rhode Island.

2. Mark Zell (hereinafter "Plaintiff Mr. Zell" or "Mr. Zell"), is K.Z.'s father and is a resident of the Village of Saunderstown in the towns of Narragansett and North Kingstown, in the County of Washington, State of Rhode Island.

3. Beth Zell (hereinafter "Plaintiff Mrs. Zell" or "Mrs. Zell"), is K.Z.'s mother and is a resident of the Village of Saunderstown in the towns of Narragansett and North Kingstown, in the County of Washington, State of Rhode Island.

4. Defendant Chariho Regional School District, (hereinafter "CRSD") is a state actor sued by and through its Superintendent, Barry Ricci, and upon information and belief has its principal offices located in the Village of Wood River Junction, Town of Richmond, County of Washington, State of Rhode Island.

5. Defendant Barry Ricci (hereinafter "Defendant Ricci" or "Ricci"), Superintendent of Chariho Regional School District and state actor is being sued in his individual capacity for individual acts and omissions that inflicted proximate injury on Plaintiffs pursuant to a municipal policy or custom, as well as in his official capacity as a state actor acting under color of law according to the meaning of same in the United States and Rhode Island Constitution; upon information and belief Defendant Ricci is a resident of Rhode Island.

6. Defendant Ryan Bridgham (hereinafter "Defendant Bridgham" or "Bridgham"), Dean of Students at CRSD and state actor is being sued in his individual capacity for individual acts and omissions

2

that inflicted proximate injury on Plaintiffs pursuant to a municipal policy or custom, as well as in his official capacity as a state actor acting under color of law according to the meaning of same in the United States and Rhode Island Constitution; upon information and belief Defendant Bridgham is a resident of Rhode Island.

7. Defendant Laurie Weber (hereinafter "Defendant Weber" or "Weber"), Former Principal at CRSD and state actor is being sued in her individual capacity for individual acts and omissions that inflicted proximate injury on Plaintiffs pursuant to a municipal policy or custom, as well as in her official capacity as a state actor acting under color of law according to the meaning of same in the United States and Rhode Island Constitution; upon information and belief Defendant Weber is a resident of Rhode Island.

8. Defendant Jon Anderson, Esq. (hereinafter "Defendant CRSD Attorney Anderson" or "Attorney Anderson"), a private actor who engaged in state action in such a way so as to become a state actor, is being sued in his individual capacity for individual acts and omissions that inflicted proximate injury on Plaintiffs pursuant to a municipal policy or custom, as well as in his official capacity as a state actor acting under color of law according to the meaning of same in the United States and Rhode Island Constitution; upon information and belief Defendant Attorney Anderson is a resident of Rhode Island.

9. Rachel McGinley (hereinafter "Defendant McGinley" or "McGinley") is not a state actor but was the student that assaulted K.Z. at CRSD; Defendant McGinley is upon information and belief a resident of Rhode Island and is not a minor.

10. Defendant Chariho School District School Committee (hereinafter "Defendant Chariho School Committee" or "School Committee"), is a state actor sued by and through its Chairperson, Sylvia Stanley, and is the public body responsible for overseeing public education in the CRSD, and has

its principal offices located in the Village of Wood River Junction, Town of Richmond, County of Washington, State of Rhode Island.

11. Defendant Craig Louzon, the Chair of the School Committee at all times relevant to this complaint and state actor is being sued in his individual capacity for individual acts and omissions that inflicted proximate injury on Plaintiffs pursuant to a municipal policy or custom, as well as in his official capacity as a state actor acting under color of law according to the meaning of same in the United States and Rhode Island Constitution; upon information and belief Defendant Louzon is a resident of Rhode Island.

12. Defendant Rhode Island Department of Education (hereinafter "Defendant RIDE" or "RIDE"), is a state actor sued by and through its Commissioner, Ken Wagner, is the public body responsible for overseeing public education in Rhode Island, the CRSD, and has its principal offices located in the City of Providence, County of Providence, State of Rhode Island.

13. Defendant Ken Wagner (hereinafter "Defendant Wagner" or "Wagner"), is the Commissioner for Defendant RIDE, is a state actor being sued in his individual capacity for individual acts and omissions that inflicted proximate injury on Plaintiffs pursuant to a municipal policy or custom, as well as in his official capacity as a state actor acting under color of law according to the meaning of same in the United States and Rhode Island Constitution; upon information and belief Defendant Wagner is a resident of Rhode Island.

14. Defendant Rhode Island Council of Elementary and Secondary Education (hereinafter "Defendant Council on Education" or "Council"), is a state actor sued by and through its Chair, Barbara Cottam, is the public body responsible for overseeing public education in Rhode Island and specifically hearing appeals of appeals to Rhode Island Department of Education for school discipline; the Council has its principal offices located in the City of Providence, County of Providence, State of Rhode Island.

4

15. Defendant Barbara Cottam (hereinafter "Defendant Cottam" or "Cottam"), is the Chair for Defendant Council on Education, is a state actor being sued in his individual capacity for individual acts and omissions that inflicted proximate injury on Plaintiffs pursuant to a municipal policy or custom, as well as in his official capacity as a state actor acting under color of law according to the meaning of same in the United States and Rhode Island Constitution; upon information and belief Defendant Cottam is a resident of Rhode Island.

16. Defendants John/Jane Does 1-20 are administrators, management, and staff within CRSD, Chariho School Committee, RIDE, and/or the Council on Primary and Secondary Education, that may or may not be state actors that caused acts or omissions that caused proximate injury on Plaintiffs that are not yet identified; once identified these parties will be named through amendment.

17. Defendants John Doe Entities 1-10 are government or private entities or public bodies or agencies actors that caused acts or omissions that caused proximate injury on Plaintiffs that are not yet identified; once identified these parties will be named through amendment.

**JURISDICTION AND VENUE**

18. This Court has proper subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343(3) in that the controversy arises under the United States Constitution, under 42 U.S.C. § 1983 for deprivation of rights to due process and equal protection secured by the Fifth and Fourteenth Amendments, under 42 U.S.C. § 1985 for constitutional conspiracy, under the Declaratory Judgement Act 28 U.S.C. § § 2201 and 2202, under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, including state torts and the judicial appeal of the R.I. Council of Elementary and Secondary Education ("Council") decision pursuant to the Administrative Procedures Act (APA), R.I. Gen.

Law § 42-35-15(a)-(b)[1] and pursuant to the Right to a Safe School provision in R.I. Gen. Law § 16-2-17(c) because Plaintiffs' state claims, including the Council appeal are so related to Plaintiffs' federal claims that they form part of the same case or controversy; consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

20. This Court has proper venue over this action pursuant to 28 U.S.C. § 1391(b) in that Defendants are subject to personal jurisdiction within the District of Rhode Island and the events giving rise to this action occurred in this District.

21. This Court has the authority to award attorneys' fees pursuant to 42 U.S.C. § 1988 and also under § R.I.G.L. 42-92-3(b).

22. All Defendants, with the exception of Defendant McGinley, and Defendants' officers, agents, and employees, are state actors that acted according to municipal policy or custom as well as state actors acting under color of law under the meaning of the United States and Rhode Island Constitution.

## FACTUAL ALLEGATION

23. Plaintiff K.Z. recently graduated from Chariho High School (CHS), the sole high school in the Chariho Regional School District ("CRSD") and under the supervision of the Chariho School Committee ("CSC").

24. Plaintiff K.Z. was an honors student and was formerly an excellent field hockey athlete.

25. Plaintiff K.Z. wanted to go to college to become a nurse.

26. Plaintiff has been a licensed Certified Nurse Assistant (CNA) almost two years and worked in that capacity helping the elderly during the latter part of high school.

---

[1] Due to time constriction and notable jurisdictional ambiguities between two key statutes dictating jurisdiction and forum for an appeal of school discipline, the APA, R.I. Gen. Law §§ 42-35-15(a)-(b) and R.I. Gen. Law § 16-2-17(c), Plaintiffs especially ask this Court to take supplemental jurisdiction over the APA, R.I. Gen. Law §§ 42-35-15(a)-(b) / § 16-2-17(c) complaint/appeal; however, to preserve remedies for the appeal against the Council, a complaint *had also been filed in both Providence Family Court and Washington County Family Court simultaneous to this action, in case this court denies supplemental jurisdiction.*

27. Prior to the events of October 16, 2015, K.Z. was never disciplined in any way at school and was a highly-regarded student behaviorally and academically.

28. Prior to the events of October 16, 2015, K.Z. had never been assaulted and battered by anyone.

29. Prior to the events of October 16, 2015, K.Z. did not have any traumatic brain injury.

30. Prior to the events of October 16, 2015, K.Z. did not have a seizure disorder.

31. Prior to the events of October 16, 2015, K.Z. was able to drive a car which she is presently not able to do medically.

32. Prior to the events of October 16, 2015, K.Z. was poised with academics, extracurricular credentials, and nursing experience, to be able to get into the colleges and universities of her choice, with notable scholarship, and *without* being waitlisted or otherwise having to suffer through being chastised for and explaining to the colleges and universities that she was applying to that she had a suspension on her record for "instigating a fight" which was never a true fact but one engineered by Defendants as demonstrated by the below allegations.

33. Plaintiff Mark Zell is Plaintiff K.Z.'s father.

34. Plaintiff Beth Zell is Plaintiff K.Z.'s mother.

35. Prior to the events of October 16, 2015, Plaintiffs Mark and Beth Zell had never had to spend large sums of money to care for K.Z. *and* fight so many government entities as each violated and perpetuated violations of their rights, K.Z.'s rights, and injured all Plaintiffs, all as a result of the events of October 16, 2015.

36. The events of October 16, 2015 should *never have happened* but for the named Defendants' intentional acts and omissions, conspiracy, negligence, and other torts in a sad tale about all individual defendants that are persons, CRSD, CSC, Rhode Island Department of Education ("RIDE"), and the Council of Primary and Secondary Education ("Council") that have caused irreparable harm to Plaintiffs through deprivation of rights and damages.

37. On or about Friday October 16, 2015, it was the end of "Sprit week" at CHS; K.Z. was a junior at CHS at the time.

38. "Sprit week" at CHS involves a series of celebrations and events prior to homecoming.

39. The Friday of "Spirit week" is the day of the big homecoming football game, culminating in a series of activities including a morning procession, outdoor activities, a bonfire, and the impending homecoming dance.

40. The Friday of "Spirit week" is a day known historically to start early for students with the seniors congregating outside wearing togas.

41. On the Friday of Spirit week, October 16, 2015, the morning starts with a pronounced procession of toga-clad seniors through the hallways of the school on the way to the first class.

42. In years past, the Friday of Spirit week is *also* a day filled with mayhem including student-driven unlawful or unethical behavior such as vandalism, profanity, lighthearted and not-so-lighthearted bantering or even aggression.

43. In years past, the Friday of Spirit week is *also* a day known for school-sponsored bad decisions such as allowing the hallways to be filled with actual hay and live animals that caused students problems.

44. Despite the history of the Friday of Spirit week, including the morning procession, being a potential time of mayhem, or at least a time of increased risk for students and school property alike, during the morning procession, on October 16, 2015, there was improper school supervision in the hallways and literally *no* school supervision in the area of hallway that K.Z. stood, as was captured on school video.

45. On the Friday of Spirit week historically, and unsurprisingly also on Friday, October 16 2015, there was *always one consistent* but benign common act: students spraying copious amounts of silly string[2] outside and in the school hallways during the morning procession.

46. On October 16, 2015, and in prior years on the same day, students spray silly string both in the air and directly at classmen, normally resulting in the expected innocent fun and laughter by classmates.

47. In prior years, the school either did not prohibit silly string or implicitly authorized its use in the hallways based on school officials' knowledge and consent; on October 16 2015, the use of silly string in the hallway was implicitly authorized by school officials seeing the acts and not in any way ever stopping it or punishing any student for its use (with the exception of K.Z.).

48. On Friday October 16, 2015, K.Z. dressed in her school spirit attire which for her, as a top-notch field hockey team member, was her uniform and carried a can of silly string.

49. During the procession on the morning of Friday October 16, 2015, K.Z. was with a group of friends, including a girl that is her former best friend, A. Doe, and was one of innumerable students spraying silly string from her position on the far-right side of the hallway nearly directly under the school video camera.

50. During the procession, as shown by a seven-minute video that was, upon information and belief, only first *fully* played publicly at the later RIDE hearing appealing K.Z.'s discipline, K.Z. sprayed silly string in the air towards different groups of students and seniors in togas as they passed her and her friends' position.

---

[2] Silly string is a toy of flexible, sometimes brightly colored, plastic string propelled as a stream of liquid from an aerosol can. The solvent in the string quickly evaporates in mid-air, creating a continuous strand. Silly String is often used during weddings, birthday parties, carnivals and other festive occasions, but it has also proven useful militarily to detect tripwires [due to the extremely lightweight nature of the resulting string]. See https://en.wikipedia.org/wiki/Silly_String

51. K.Z. and her friends were positioned against the right wall of the hallway next to a vestibule that led into another part of the school.

52. During the procession, as shown by the seven-minute video, K.Z. *never* sprayed *any student "in the face"* with silly string.

53. During the procession, as shown by the seven-minute video, K.Z. sprayed silly string indiscriminately up in the air toward three to four groups of students over the course of several minutes.

54. Also during the seven-minute video, several *other students* sprayed silly string in the school hallway both by spraying up in the air but also sometimes spraying it *directly* at other students at close range and *"in their faces"* also as the students walked by or stood in the hallways.

55. In fact, towards the end of the video, K.Z. was herself sprayed with silly string at point-blank range directly in her face by a student passing by.

56. During the video, less benign acts than spraying silly string occurred; one or more students vandalized three separate banks of lockers in plain view, innumerable students carried and dropped streamers or other litter in the hallway, some students appear to have been yelling profanities or other inappropriate words at one another,[3] and some students conducted lighthearted and some not-so-lighthearted bantering and shows of aggressive bantering.

57. But during the course of the seven-minute video, what was most notable of all however, was the totally unprovoked assault and battery that occurred to K.Z.

58. During approximately the middle of the seven-minute video, K.Z. is brutally assaulted and battered by Defendant McGinley when she ran up to K.Z. from behind and with multiple "hammer blows" struck K.Z. in the back of the head with the hard edge of her cell phone, resulting in K.Z. falling forward and disappearing from the video camera into a vestibule for several minutes of the video.

---

[3] The school hallway video is very clear visually but has no audio.

10

59. As K.Z. falls forward after being struck by Defendant McGinley, Defendant McGinley is seen on the video running off camera laughing and clearly holding her cell phone in the hand used to strike K.Z.

60. But just prior to the unprovoked assault and battery, K.Z. had been happily standing with friends spraying silly string in the air across the hallway at two to three other groups of students with togas as they proceeded down the hallway without reaction except the expected non-reaction or laughter.

61. Just prior to the unprovoked assault and battery, K.Z. saw down the hallway another group of students in togas approaching in K.Z.'s direction on the far-left side of the hallway at quite a distance with several students walking and lingering between K.Z. and the next group of toga clad students.

62. Due to the distance, K.Z. did not know who was in that group of toga clad students.

63. As shown by the video, and verified by a veteran Providence Police Investigative Expert, it would be difficult or impossible to recognize or aim at any of the individual students' due to the great distance.

64. Immediately preceding the assault and battery, as the group wearing togas approached still at a great distance, K.Z. once again raised her can of silly string up in the air (over the head of a much taller student) and squirted a quick spray of silly string in the direction of the group of togas-clad students.

65. Based on the plain view of the video and expert opinion, at the time K.Z. sprayed that silly string, the group of togas were down the hallway from K.Z.'s position by a distance of approximately eight (8) to ten (10) feet; this measurement was determined by the expert as a calculation of the distance of the width of the hallway (since the parties were on opposite sides) and the additional distance vertically based on the doors and number of lockers between the positions of the parties.

66. Once sprayed, the silly string K.Z. squirted in the air flew down and across the hallway and rained down on what the video then shows as a group of girls in togas.

67. The silly string sprayed by K.Z. landed, from the air, down on two or more girls in that group.

68. K.Z.'s act of spraying silly string was in the air and not "in the face" of anyone.

69. Defendant McGinley was one of the girls in togas that ended up with a single strand of silly string tat rained down on her hair.

70. Defendant McGinley, while continuing to walk down the left side of the hallway (on the video), noticed the silly string while talking to her friends.

71. After K.Z. sprayed the silly string, the video shows that K.Z. turned to talk to her friends as she had done a number of times during the seven-minute video.

72. Defendant McGinley, while continuing to walk down the left side of the hallway (on the video), easily swiped the strand of silly string off the left side of her hair and as she did, turned her head to the left.

73. While K.Z.'s back was turned, Defendant McGinley saw K.Z. to her left up the hallway.

74. Upon seeing K.Z. up and across the hallway, Defendant McGinley turned to the left and sprinted directly towards K.Z.'s turned back.

75. K.Z. had no idea that Defendant McGinley was sprinting toward her.

76. The time of this event was approximately 7:30 AM on that Friday, October 16, 2015.

77. Upon reaching K.Z., Defendant McGinley stopped directly behind K.Z. with her right arm raised.

78. Defendant McGinley's raised her right arm held her cell phone.

79. Defendant McGinley then used what the school characterized as several "hammer blows" to beat K.Z.'s head with the hard edge of her cell phone, as shown by the video.

80. Defendant McGinley's cell phone, specifically the hard edge of her cell phone, pounded into the back of K.Z.'s head two or three times with significant visible force.

81. Upon being struck from behind, K.Z. was scared by being struck and the prospect of more strikes.

82. K.Z. however did not have time to make any defensive moves; she then falls forward and is out of view of the camera for several minutes.

83. As noted, after striking K.Z. in the head with a cell phone, Defendant McGinley runs away from K.Z., in the same direction she had been walking.

84. As Defendant McGinley runs away the video shows she is laughing or smirking and holding a cell phone in the hand used to deliver the blows to K.Z.'s head.

85. As a result of the blows to the head, K.Z. suffered a concussion; the concussion was not known yet.

86. K.Z. went to class feeling dazed and with her head hurting, which she reported to several teachers, including a teacher that was a nurse, and other staff members during that morning.

87. K.Z. was called out of class to go to Defendant Bridgham's office shortly after the hallway assault.

88. In Defendant Bridgham's office K.Z. had trouble comprehending what Defendant Bridgham was stating to K.Z.; K.Z. understood that Defendant McGinley had reported to school officials that she had hit K.Z. in the head.

89. K.Z. confirmed she had been hit in the head, but K.Z. did not yet know that the blows were delivered with a cell phone.

90. Notably, no school official, despite all those that interacted with K.Z. after the events at 7:30 AM through approximately four hours later at 11:30 AM when K.Z.'s father, Plaintiff Mark Zell arrived, asked K.Z. about the head blows, asked K.Z. how she felt, nor sent K.Z. to the nurse for evaluation of a concussion, despite school officials knowing K.Z. had been hit in the head.

91. During the interview with K.Z. Defendant Bridgham also did not ask K.Z. important questions such as if K.Z. had sprayed Defendant McGinley "in the face" with silly string or called her a "bitch."

92. Defendant Bridgham barely asked K.Z. any questions and then sent K.Z. back to class.

93. K.Z. was clearly not fully competent at the time of Defendant Bridgham's interview, as well as in pain, and as it turns out this is because K.Z. was in a concussed state during the interview.

94. K.Z. returned to class where she again complained to teachers and staff that her head hurt and again no one sent her to the nurse.

95. K.Z. was then called back to Defendant Bridgham's office not long after the first time.

96. Defendant Weber was in the room during one or both of the times K.Z. was in Defendant Bridgham's office but did not participate in asking K.Z. any questions, did not ask her how K.Z. was feeling, did not ask her about what really happened, and did not send K.Z. to the nurse.

97. Upon information and belief, by the time of the second interview, Defendant Ricci had been notified of the events by either or both of Defendant Bridgham or Defendant Weber.

98. Upon information and belief, the events were also relayed to Defendant Attorney Anderson.

99. Also around this time, approximately one hour to two hours after the events, the video from the hallway camera was requested from the IT department by one or all of Defendants Weber, Defendant Bridgham, and/or Defendant Ricci.

100. The video was, upon information and belief, delivered within a few hours of the event.

101. No Defendant watched the video, according to sworn testimony, prior to the following Monday.

102. Thus, according to sworn testimony, no Defendant watched the *known* video of the events before calling K.Z. back to Defendant Bridgham's office.

103. Had the CRSD Defendants (Bridgham, Weber, Ricci) watched the video Defendant McGinley's report would have been proven to be a lie.

104. Upon returning to Defendant Bridgham's office, again after very little questioning, while K.Z. was still dazed with a reported hurting head, Defendant Bridgham informed K.Z. she suspended.

105. The aforesaid allegations of K.Z. spraying Defendant McGinley "in the face" with silly string and calling her a "bitch" which was what *only* Defendant McGinley reported as the story, were the exact bases used on K.Z.'s discipline form suspending K.Z.

106. Notably, Defendant McGinley had actually confirmed, prior to any discipline assignment, that she did not hear K.Z. say the word "bitch" before she struck K.Z. and only believed it was said because her friends had told her about the word being *after* Defendant McGinley had already struck K.Z.

107. Upon information and belief, no other student confirmed Defendant McGinley's story of being "sprayed in the face" with silly string and K.Z. yelling "bitch" before spraying the silly string at any time during the "investigation" or before K.Z.'s assignment of discipline of a one day suspension.

108. In fact, the video contradicts that story strikingly.

109. Moreover, not one witness ever alleged that K.Z. had yelled "bitch" before spraying silly string until over a year after the incident and at that point, there was only one person to *ever* allege this: K.Z.'s former best friend.

110. Upon information and belief, the events were *initially* reported as and investigated as an unprovoked assault by the School Resource Officer.

111. Nonetheless, K.Z. was assigned a one day suspension for the student code offense of "fighting (or instigating a fight)."[4]

112. Defendant McGinley was also suspended for one day for the same offense.

113. The student code does not define "instigating" a fight in any way whatsoever nor does it define what level of intent and acts are required to qualify as violating the code and deserving of a suspension.

---

[4] This is the exact wording in the student discipline code – there is *no* definition beyond those words with "instigating" in a parenthetical.

114. A suspension, no matter if it is served in or out of school, remains on the permanent record of a student and *must* be reported to educational institutions as well as on many job applications.

115. Once informed of the suspension, K.Z. began crying hysterically and called her Plaintiff Mark Zell.

116. Defendant Bridgham and/or Defendant Weber or other agents of CRSD directed K.Z. to go into a room with other students working in it to wait.

117. K.Z. was placed in this room still without having been evaluated for a concussion by the nurse, and while crying hysterically complaining of pain and not feeling well.

118. While waiting in the room, students that were friends of Defendant McGinley entered the room and harassed K.Z. for being "beat up" by Defendant McGinley.

119. Defendant McGinley was heard, even by teachers, bragging about "beating up" K.Z. that day.

120. Plaintiff Mark Zell arrived at CHS at approximately 11:00 A.M. that day and after being updated about the events, Plaintiff Zell asked if school officials had evaluated K.Z. for a concussion.

121. School officials, including CRSD Defendants stated that this "would be a good idea."

122. School officials then directed the nurse to come evaluate K.Z.; it was approximately four (4) hours after the head injury.

123. The nurse evaluated K.Z. and immediately found, upon a single assessment, when normally multiple assessments are necessary, that K.Z. likely had a concussion.

124. K.Z. was directed to seek immediate medical attention.

125. Plaintiff Mark Zell took K.Z. to the hospital.

126. At the hospital Plaintiff K.Z. was diagnosed with a serious concussion and the doctors told Plaintiffs K.Z. and Mark Zell that too much time had elapsed to conduct a CT scan.

127. Plaintiffs Mark and Beth Zell went to the Richmond Police Department (hereinafter "police") that evening, on Friday October 16, 2015, and filed a police report for the assault and battery of their minor daughter by Defendant McGinley.

128. Plaintiffs Mark and Beth Zell were first told by the officer that the spoke with that the police would arrest Defendant McGinley immediately that Friday night.

129. However, that officer later informed Plaintiffs Mark and Beth Zell that the police thought it better to arrest Defendant McGinley at school, using the School Resource Officer, on the next Monday.

130. On the Sunday of that weekend, there was an email exchange between the Chief of the Richmond Police Department and Defendant Ricci discussing Plaintiff Mark Zell.

131. The exchange appeared to be discussing Plaintiff Mark Zell in a less than favorable light or discussing the allegations he had made.

132. The next day, the Monday, Plaintiff Mark Zell was informed that Defendant McGinley would not be arrested unless he was willing to have K.Z. arrested also – both for the crime of "Disorderly Conduct."

133. The police plan to arrest only Defendant McGinley and arrest her for assault and battery, not disorderly conduct, was changed for reasons never explained to Plaintiffs.

134. During this same time frame, there are emails between Defendants Bridgham, Weber, Ricci and others searching social media with communications for information about K.Z.

135. The emails make it clear the CRSD Defendants were trying to build a case against K.Z. and dig up dirt on her, which could not be found; the emails show this was frustrating Defendants.

136. On or about that same Monday, Plaintiff Mark Zell was finally shown the video.

137. According to sworn testimony, school officials including the named CRSD Defendants (Bridgham, Weber, Ricci) did not watch the video for the first time until approximately this same day and time.

138. On or about the next day or the Wednesday, October 21, 2015, Plaintiffs Mark Zell and Beth Zell returned to the school and viewed the video again.

139. During this visit to the school, Plaintiffs Mark Zell and Beth Zell again asked school officials why Defendant McGinley was not being arrested for assault and battery of K.Z.

140. In response, school officials, including named CRSD Defendants, responded by reiterating that Defendant McGinley could only be arrested for "disorderly conduct" if K.Z. would also be arrested.

141. Due to this threat of criminal charges against K.Z., Plaintiffs Mark and Beth Zell decided they could not pursue charges against Defendant McGinley; they made the decision not to pursue criminal charges against Defendant McGinley *solely* to avoid more unjustified criminal charges against K.Z.

142. K.Z. was home from school for approximately six school days recovering from the concussion.

143. During this time, Plaintiff Mark Zell attempted to get answers from the school and police about why Defendant McGinley was not being arrested and how the situation had changed to *both* students being arrested for "disorderly conduct"; he never received an answer.

144. Plaintiff Mark Zell also appealed the suspension to the Superintendent, Defendant Ricci, and wrote a detailed accounting of events as reported by K.Z., her friends, and the video.

145. Defendant Ricci asked to speak to K.Z. prior to writing his decision.

146. Plaintiff Mark Zell emailed Defendant Ricci explaining that K.Z. was still recovering from the concussion and asked if the discussion could be held with K.Z. when she had further recovered.

147. Defendant Ricci wrote his decision without interviewing K.Z.

148. Defendant Ricci also wrote his decision the same day or the day after Plaintiff Mark Zell's detailed appeal, and with minimal investigation by Defendant Ricci.

149. Prior to Plaintiffs Mark or Beth Zell being told the outcome of Defendant Ricci's decision, Defendant Bridgham informed K.Z. that her suspension had been upheld and scheduled her for suspension.

150. Following K.Z. telling Plaintiff Mark Zell and his subsequent communications with Defendant Ricci, Defendant Ricci wrote an email to Defendant Bridgham chastising him, stating that Defendant Bridgham should not have disclosed that Defendant Ricci's appeal decision had already been made.

151. Defendant Ricci's written decision claimed extensive investigation and upheld the suspension.

152. Defendant Ricci deprived K.Z.'s an opportunity to be heard and of an impartial decision maker as required by due process.

153. Again, Defendant Ricci never even *spoke* to K.Z. prior to his final written appeal decision.

154. Following the adverse decision by Defendant Ricci, Plaintiffs appealed the suspension to the Chariho School Committee ("CSC").

155. Notably during the time leading up to the CSC hearing, Defendant Bridgham emailed Defendant Ricci with a communication that included (a) a derogatory reference to Plaintiff Mark Zell, (b) a detailed "analysis" of how to overcome Plaintiff Mark Zell's arguments at the upcoming CSC hearing, and (c) a statement by Defendant Bridgham about how he was "only sharing" the information with Defendant Ricci, implying secrecy.

156. In the same time fame, Defendant Ricci emailed Defendant Bridgham informing Defendant Bridgham that certain information should not be shared with the School Committee.

157. At the upcoming CSC hearing, Defendant Attorney Anderson was to represent the CRSD and Defendant Ricci, prosecuting the upholding of K.Z.'s suspension by Defendant Ricci.

158. The CSC's job was to impartially evaluate Defendant Ricci's decision to uphold the suspension.

159. As such, the CSC needed its own representation other than Defendant Ricci's lawyer Defendant Attorney Anderson.

160. In other words, the CSC needed to hire *their own* lawyer.

161. However, it was Defendant Ricci, not the CSC or its Chair Defendant Louzon, that emailed a law firm seeking counsel *to represent the CSC* at the upcoming CSC hearing.

162. In the email from Defendant Ricci to the lawyer, the lawyer first stated that he was not available.

163. Defendant Ricci responded nearly begging the lawyer to represent the CSC; it was clear Defendant Ricci and the lawyer had a past relationship.

164. In response to Defendant Ricci's further request, minutes later the lawyer responded that his schedule had been cleared and he would appear to represent the CSC at the CSC appeal hearing.

165. Long before the CSC hearing, and despite having had access to the video clearly showing a cell phone in Defendant McGinley's hand striking K.Z., it came to the attention of the CRSD defendants (Bridgham, Weber, Ricci and upon information and belief also Defendant Attorney Anderson) that K.Z. was in fact struck with a cell phone and not a fist.

166. Then just before the CSC hearing, it came to the attention of the same CRSD defendants, as well as upon information and belief to Defendant Attorney Anderson, that there was a video of Defendant McGinley striking another student in the head with a cell phone while on a bus.

167. At the CSC hearing in or about February 23, 2016 the *lawyer hired by Defendant Ricci to represent the CSC* was present and appeared to conduct the hearing; that lawyer appeared to be the person to rule on objections made by Plaintiffs' prior counsel and rule on objections made by Defendant Attorney Anderson.

168. At the CSC hearing, Defendant Attorney Anderson began the presentation to school committee members by stating something to the effect of "a cell phone is a teenage girl's most prized possession" and would "never" be used as a weapon.

169. Defendant Attorney Anderson made this representation, and all CRSD Defendants present at the CSC hearing (Bridgham, Weber, and Ricci) allowed the representation to go uncorrected when all of these Defendants had knowledge that Defendant McGinley *had used a cell phone to strike K.Z.*; in fact, all also had knowledge Defendant McGinley *had used a cell phone to strike another* student.

170. Defendant Attorney Anderson presented to the school committee only parts of the full video that omitted the many times K.Z. sprayed silly string in the air without incident, omitted the other students spraying silly string, and omitted K.Z. being sprayed with silly string directly in the face long after she was assaulted.

171. These events were all known by Defendant Attorney Anderson (and all CRSD Defendants) to be on the video but withheld from the school committee.

172. Also during the CSC hearing, Defendants Attorney Anderson, Ricci, Weber, and Bridgham made other misrepresentations and stated other mistruths.

173. Moreover, the lawyer hired (by Defendant Ricci) to represent the CSC during the hearing, allowed Defendant Attorney Anderson to prevail on objections and unfairly blocked Plaintiffs' former attorney in numerous ways.

174. Plaintiffs were not allowed to show the video of Defendant McGinley striking another student in the head with a cell phone on the bus and were precluded from presenting other evidence.

175. Plaintiffs perceived the CSC hearing as depriving them of their opportunity to be heard and also being deprived of an impartial or fair hearing as required by due process.

176. Immediately following the CSC hearing, Defendant Weber stated to Plaintiffs to the effect that if K.Z. had not been hit she would not be suspended; Plaintiff Mark Zell documented the comment.

177. Later, following the CSC hearing, the *CSC attorney emailed* Defendant *Ricci's assistant* with the decision he wrote and asked her to check facts.

178. In response, Defendant Ricci's assistant emailed the alleged CSC attorney back indicating that she was very happy with the decision he had written.

179. The alleged CSC attorney and Defendant Ricci's assistant then discussed how they would logistically get Defendant Louzon, the chair of the CSC, to sign the CSC appeal decision document.

180. Defendant Louzon, upon information and belief, signed the CSC appeal decision document without review or input.

181. The CSC decision affirmed Defendant Ricci's decision to uphold K.Z.'s suspension.

182. Following that decision, Plaintiffs appealed to RIDE and hired present counsel.

183. The RIDE hearing was conducted in the summer of 2016 and included two full days with over ten (10) witnesses, which resulted in nearly a foot of transcripts.

184. During the testimony, there was only one witness out of all of the school witnesses that claimed that K.Z. yelled "bitch" before spraying silly string in the direction of Defendant McGinley: the former best friend A. Doe.

185. K.Z. admitted to saying "bitch" but only *after* she had been beat in the head by Defendant McGinley.

186. That same witness, A. Doe, also, and for the first time in nearly one year after the events, *first* recounted a story about K.Z. asking if she should spray Defendant McGinley before doing so.

187. Notably, during the RIDE hearing, A. Doe was impeached and admitted to lying about a number of facts, not just by Plaintiffs' attorney but even Defendant Attorney Anderson represented A. Doe as a liar despite the fact that he represented the CSC and A. Doe was his witness.

188. Also during the RIDE hearing, on cross examination, Defendant Bridgham began to explain that there was a lack of some needed policy or some related failure by the school district to handle the situation, including K.Z.'s concussion.

189. Defendant Bridgham continued that he brought the failure to Defendant Ricci's attention and began to state that if he had it to do again [he would change...], but he was then cut off.

190. Notably, Defendant Bridgham was cut off by his own Attorney, the CSC attorney Defendant Anderson; Defendant Anderson cut off the testimony of Defendant Bridgham by *objecting to his own witness' testimony.*

191. Plaintiffs objected and pointed out that Defendant Anderson could not object to his own witness' testimony.

192. Defendant Attorney Anderson agreed; however neither Defendant Attorney Anderson nor the Hearing Officer of RIDE allowed Defendant Bridgham to conclude his admission.

22

193. The statement, if finished, upon information and belief, would have led to a full admission of liability to the harm that came to K.Z. due to CRSD's negligence and other unlawful acts.

194. Also during the RIDE hearing, Plaintiffs cross examined the school witnesses about the now infamous alleged act of spraying silly string "in the face" of Defendant McGinley; these witnesses all told vastly different stories about a very up-close acts[5] of spraying silly string that was blatantly contradicted by the video as each witness, including A. Doe, was impeached on this fact.

195. Plaintiffs also presented an expert witness in investigation who testified as to a number of facts based on his viewing of the video, such as that the parties were at least eight (8) to ten (10) feet apart at the time K.Z. sprayed the silly string towards the group Defendant McGinley was included.

196. During the hearing, at a break, Defendant Ricci and the RIDE Hearing Officer were seen in a room alone talking with the video playing as Defendant Ricci pointed out parts of the video to the RIDE Hearing Officer ex parte.

197. Neither Defendant Attorney Anderson nor the Hearing Officer authorized the ex parte meeting and viewing of the video between the RIDE Hearing Officer and Defendant Ricci with Plaintiffs nor disclosed the event at any point to date.

198. After the hearing, the RIDE decision was shockingly short citing to virtually no evidence, citing to literally none of Plaintiffs' evidence, ignoring significant evidence counter to the findings, and relied solely on A. Doe's contradicted and impeached testimony, provided no credibility weighing or reasoning, and justified upholding the suspension after a two day hearing using only approximately two-and-a-half pages discussing the merits of that decision.

---

[5] A. Doe stated K.Z. was less than two feet from Defendant McGinley when K.Z. sprayed the silly string that landed on Defendant McGinley; Defendant McGinley stated she was three feet away from K.Z. when sprayed; K.Z. stated that she was six to eight feet away when she sprayed; and the Expert testified K.Z. was eight to ten feet away when she sprayed. The video supports K.Z. and the Expert's distance and in no way supports A. Doe and Defendant McGinley's statements.

199. Plaintiffs felt that due to the undisclosed ex parte meeting between the Hearing Officer and Defendant Ricci, due to the misrepresentations of facts by Defendant Attorney Anderson, due to the Hearing Officer barring relevant Plaintiffs' evidence and writing a decision not supported by law and facts, that they were deprived of an opportunity to be heard and deprived of an impartial decision maker.

200. For the reasons above, K.Z., by and through her parents Mark and Beth Zell, then appealed to the Council of Primary and Secondary Education ("Council") assigning a number of errors by RIDE described in Count V.

201. While awaiting review by the Council the school forced K.Z. to serve her suspension in school; served or not (and served in or out of school) *the suspension will remain on her record* and must be reported to all present and future educational institutions and jobs for the rest of her life unless overturned.

202. Notably, prior to serving the in-school suspension, Plaintiff K.Z. requested an ADA/Section 504 accommodation to serve the suspension at home and not at school.

203. K.Z. was a qualified person with a disability given she had known, diagnosed medical conditions including migraines, anxiety, and seizures that substantially impair one or more major life function.

204. The reason for the request that K.Z. serve the suspension at home was because K.Z.'s parents and doctors were concerned about the effect serving the suspension, with all of the event that had happened and her disabilities, in a room at the school where K.Z. could experience emotional distress that could trigger her headaches, anxiety, and seizures.

205. The ADA/504 accommodation request was flatly denied, in writing, without explanation by Defendants Ricci and Defendant Attorney Anderson.

206. K.Z. did in fact react badly to the in-school suspension which triggered symptoms of her disabilities such as a severe migraine and anxiety.

207. In the process of appealing the Council, the *full record* provided to the Council included nearly a foot-high stack of transcripts, an appeal brief by K.Z. that was 45 pages (single-spaced) with hundreds of citations to the nearly foot-high transcript record and nearly as many citations to legal precedent supporting allegations that RIDE had committed *several* errors under the standard of arbitrary, capricious, or unfair[6]; K.Z. also produced a 36-page reply brief to Chariho School District's opposition to the appeal.

208. In comparison, Chariho School District's opposition to the appeal was 18 pages (double-spaced) with *no* notable citation to the nearly foot-high transcript record, with only citations to the scant RIDE decision, and included a few off-point cases.

209. Irrespective of the long and detailed record and briefs and after about 20 minutes of oral arguments by K.Z.'s attorney and a few comments by Chariho School District's attorney, the Council "*deliberated*" *for only approximately 5 minutes*.

210. Notably during deliberation, the Council members "deliberating" were heard (from a closed room several feet away) laughing loudly and discussing matters irrelevant to the proceeding.

211. The Council and RIDE share the exact same office space.

212. The oral decision of the Council found "substantial evidence"; however, that finding only addressed one of the five groups of errors alleged by the Plaintiffs; moreover, the council could not and did not explain the reasoning for *how* there was no substantial evidence for the four key RIDE findings.

213. Plaintiffs asked the Council for a decision on the other four groups of errors alleged against RIDE and the Council could not answer and stated it would all be explained with detailed reasoning in their final May 9, 2017 decision.

---

[6] The Council of Elementary and Secondary Education reviewing a RIDE decision is that the RIDE decision must be overturned if it is "patently arbitrary, capricious, or unfair." See Perrino v. The Rhode Island Board of Regents for Elementary and Secondary Education and the Providence School Board, C.A. No. PC 10-4247 (Aug. 2, 2011); (quoting Perrino 0014-01 Commissioner of Education Decision *11-12 (Dec. 1, 2008)).

214. On or about May 9, 2017, the Council's Decision was released affirming the discipline; the decision was *only* five pages long and found against Plaintiffs on *all five groups of errors* assigned, but provided *no reasoning whatsoever.*

215. The May 9, 2017 Council decision simply decided against all five alleged groups of errors, summarily dismissing any error without any explanation. See **Exhibit A**.

216. As such, Plaintiffs judicially appeal the Council's decision as arbitrary, capricious, and unfair and violates the standard required by the Administrative Procedures Act (APA) as alleged in Count V.

217. During the time of these administrative battles, all Plaintiffs suffered emotionally, and Plaintiffs Mark Zell and Beth Zell incurred enormous expense in both medical treatment for K.Z. and for lawyers.

218. K.Z. was never able to play field hockey again, was diagnosed with a seizure disorder related to the concussion, and had difficulty getting into a college of her choice because of the discipline on her record for "instigating a fight," also losing out on scholarship money.

219. To date, Plaintiff K.Z. has discipline on her record and K.Z. can now no longer drive due to medical restrictions due to her new-found seizure disorder which developed proximately to the concussion.

220. To date, Plaintiff K.Z. also suffers seizures and from serious headaches which she did not have before.

221. And to date, Plaintiff K.Z. suffers from reputational harm due to the defamatory accusation that she "instigated a fight" simply by spraying silly string in the air on the Friday of Spirit week.

222. To date, all Plaintiffs Mark Zell and Beth Zell suffer from deprivation of rights and injuries.

223. All Defendants and their officers, agents, and employees, with the exception of Defendant McGinley, are state actors that acted under color of law under the United States and Rhode Island Constitutions, 42 U.S.C. §§ 1983, 1985, and 1988, acted pursuant to a municipal policy or custom,

and acted within the scope of their employment with the Defendant government entities, bodies, or agencies.

224. As a direct and proximate result of the acts and omissions of Defendants and their agents acts and omissions, Plaintiffs have suffered liberty and property deprivations, deprivations of other rights guaranteed by the Constitution, suffered physical injury with permanent and ongoing pain and suffering, have suffered humiliation and loss of standing in the community, have suffered emotional distress and mental anguish resulting in physical injury, and have suffered from economic damages. All deprivations, injuries, and damages continue to date.

## COUNT I
*Violation of Procedural Due Process under the Fifth and Fourteenth Amendment of the United States Constitution and Article 1, Section 2 of the Rhode Island Constitution, Pursuant to 42 U.S.C. § 1983*
**(All Defendants Except Defendant McGinley)**

225. Plaintiffs incorporate by reference ALL paragraphs above as if fully set forth herein.

226. The Fifth and Fourteenth Amendment of the United States Constitution, Civil Rights Act of 1871, 42 U.S.C. § 1983, and Article 1, Section 2 of the Rhode Island Constitution provide that no person shall be deprived of liberty or property without due process of law.

227. The aforesaid Constitution provisions and statute protects individuals from violations of rights protected by the Constitution or laws of the United States and Rhode Island that are committed by persons acting under the color of state authority.

228. Plaintiff K.Z. had a right and liberty interest in not being deprived of her reputation, a right to not endure "stigma" plus a right to not be deprived of present or future educational, scholarship, and job opportunities without procedural due process of law.

229. Plaintiffs Mark Zell and Beth Zell had a property interest in not being deprived of their money without due process of law.

27

230. Procedural due process of law requires that, prior to being deprived of a right that is a liberty or property interest, that state actors must provide Plaintiffs with proper notice, opportunity to be heard, and a fair hearing with an impartial decision maker.

231. In contravention of law, all state actor Defendants (which excludes Defendant McGinley) deprived Plaintiff K.Z. of a liberty interest by wrongly accusing Plaintiff K.Z. of instigating a fight, assigning a suspension permanently on her record, and when appealed, these defendants deprived Plaintiffs of proper notice, opportunity to be heard, and/or a fair hearing with an impartial decision maker in each of the appeals to the superintendent (Defendant Ricci), the Defendant CSC prosecuted by Defendant Attorney Anderson, the hearing with Defendant RIDE and the Defendant Council hearings which were again prosecuted by Defendant Attorney Anderson.

232. Plaintiff K.Z. was, as a result of these Defendants' agents' acts and omissions, deprived of a liberty interest due to harm to her reputation coupled with the loss of real and potential future educational, scholarship, and job opportunities.

233. Reputational harm, or "stigma," coupled with the loss of real and future government and private educational, scholarship, and/or job opportunities is the "plus" required to meet the "stigma plus" standard which establishes a deprivation of Plaintiff's liberty interest.

234. The RIDE decision confirmed that K.Z. had a protected liberty interest based on stigma plus.

235. Specifically, Plaintiff was deprived of her reputation by the defamatory allegation that Plaintiff K.Z. "instigated a fight" that was levied without care or deliberation.

236. Plaintiff K.Z. has and will be deprived of present and future educational, scholarship, and/or employment due to the requirement that Plaintiff K.Z. disclose the suspension for "instigating a fight" on all college and graduate school applications, and any/all scholarship and/or future job opportunities that ask about school suspensions.

237. Therefore, Defendants deprived Plaintiff K.Z. of her liberty interests without due process of law, in violation of the right guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under Article 1, Section 2 of the Rhode Island Constitution.

238. Also in contravention of law, all state actor Defendants (which excludes Defendant McGinley) deprived Plaintiffs Mark Zell and Beth Zell of a property interest by Defendants failing to provide proper notice, opportunity to be heard, and/or fair hearings with impartial decision makers during the initial and ongoing appeals of K.Z.'s discipline, resulting in large sums of money being constructively taken away from Plaintiffs proximately due to Defendants actions.

239. Therefore, Defendants deprived Plaintiffs Mark Zell and Beth Zell of property interests without due process of law, in violation of the right guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under Article 1, Section 2 of the Rhode Island Constitution.

240. Defendant entities had in place, and state actor Defendants that are persons followed, policies, customs, patterns and practices which were the moving force in depriving Plaintiffs their rights.

241. Defendants' policies, customs, practices, and conduct are arbitrary and capricious in violation of the Fifth and Fourteenth Amendment United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under Article 1, Section 2 of the Rhode Island Constitution.

242. Plaintiffs all seek redress for violations of Plaintiff's constitutionally protected interests and rights committed by Defendants while acting under the color of state law.

243. Defendants' agents' actions that resulted in the property and liberty deprivations were acts that shock the conscience.

244. Defendants and their agents' actions were intentional and/or reckless, were taken for the purpose of causing a deprivation of Plaintiffs' stated liberty and property rights secured by the United States and Rhode Island Constitutions or in reckless disregard of Plaintiffs' due process rights.

245. Plaintiffs experienced the aforesaid damages as a proximate result of named Defendants and their respective agents' intentional conduct.

246. Because all Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

247. Defendants that are not persons are liable for the actions of their agents, employees, and officers.

## COUNT II
### *Violation of Equal Protection under United States Constitution and Article 1, Section 2 of the Rhode Island Constitution Pursuant to 42 U.S.C. § 1983*
### (All Defendants Except Defendant McGinley)

248. Plaintiffs incorporate by reference ALL paragraphs above as if fully set forth herein.

249. Plaintiff K.Z. was singled out by the government and state actors, becoming the specter of arbitrary classification and differential treatment.

250. Upon information and belief, similarly situated students at Chariho High School were not singled out by CRSD and the CSC, as Plaintiff K.Z. was, for adverse and differential treatment.

251. Upon information and belief, similarly situated students before RIDE and the Council were not singled out for adverse and differential treatment.

252. Accordingly, Plaintiff K.Z. falls within a protected class.

253. Defendants, by the aforesaid actions and/or omissions, have deprived Plaintiff K.Z. of her equal protection of rights guaranteed under Article 1, Section 2 of the State Constitution and the Fifth and Fourteenth Amendments of the federal Constitution.

254. Defendant entities had in place, and state actor Defendants that are persons followed, policies, customs, patterns and practices which were the moving force in depriving Plaintiffs of their rights.

255. Defendants' policies, customs, practices, and conduct are arbitrary and capricious in violation of the Fifth and Fourteenth Amendment United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under Article 1, Section 2 of the Rhode Island Constitution.

256. Plaintiffs all seek redress for violations of Plaintiff's constitutionally protected interests and rights committed by Defendants while acting under the color of state law.

257. Plaintiffs experienced the aforesaid damages as a proximate result of named Defendants and their respective agents' intentional conduct.

258. Because all Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

259. Defendants that are not persons are liable for the actions of their agents, employees, and officers.

## COUNT III
*Violation of 42 U.S.C. § 1985 for Constitutional Civil Conspiracy To Interfere with Civil Rights of Equal Protection of the Laws and Deprivation of Due Process Rights Guaranteed under United States Constitution and Article 1, Section 2 of the Rhode Island Constitution*
**(Defendants Barry Ricci, Chariho Regional School District, Ryan Bridgham, Laurie Weber, Attorney Jon Anderson, and Craig Louzon)**

260. Plaintiffs incorporate by reference ALL paragraphs above as if fully set forth herein.

261. Plaintiffs had a right to not be deprived of their rights to equal protection of the laws, rights to equal privileges and immunities under the laws, and rights to property and liberty interests without due process of law all guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution and under Article 1, Section 2 of the Rhode Island Constitution.

262. All Defendants (except Defendant McGinley) and their officers, agents, and employees, are state actors that acted under color of law according to under the United States and Rhode Island Constitutions, and 42 U.S.C. § 1985 and pursuant to government policies, customs, patterns and practices.

263. All state actor Defendants that are not persons are separate entities.

264. All state actor Defendants that are persons were acting within the scope of authority for their respective entities.

265. Two or more to all of the state actor Defendants acting under color of law formed an agreement and common plan or design to harm Plaintiffs by depriving the Plaintiffs of their rights.

266. The agreement for the common plan or design to cause Plaintiffs harm included, but is not exclusive to:

   a. Plans to improperly investigate what was an unprovoked assault and battery by Defendant McGinley against Plaintiff K.Z.;

   b. Plans to cover up the fact that an assault and battery was what happened;

   c. Plans to influence the Richmond Police Department to not arrest Defendant McGinley on the Friday of the assault and battery but instead to arrest Defendant McGinley for assault and battery on the next Monday at school;

   d. Plans to influenced the Richmond Police Department's drastic change from arresting Defendant McGinley for assault and battery to plans to arrest both Plaintiff K.Z. and Defendant McGinley for "disorderly conduct" or arrest neither;

   e. Plans to cover-up, for purposes of assumedly avoiding civil liability, and acts in furtherance of the plan by *assigning* Plaintiff K.Z.'s discipline, a permanent suspension on her record;

   f. Plans to cover-up, for purposes of assumedly avoiding civil liability, and acts in furtherance of the plan, by *Defendant Ricci* upholding Plaintiff K.Z.'s discipline;

g. Plans to cover-up, for purposes of assumedly avoiding civil liability, specifically by Defendants Ricci, Defendant Chariho School Department, Defendant Bridgham, Defendant Weber, Defendant Attorney Anderson, by attempting to gather social media evidence about *only* K.Z. immediately after the assault by Defendant McGinley;

h. Plans to cover-up and influence the School Committee, specifically by Defendants Ricci, Defendant Chariho School Department, Defendant Bridgham, Defendant Weber, Defendant Attorney Anderson, and Defendant Louzon, to uphold Defendant Ricci's appeal by misleading members prior to the CSC hearing by gathering evidence to support their side and by decisions to not share information with school committee members;

i. Plans to cover-up and influence the School Committee, specifically by Defendants Ricci, Defendant Chariho School Department, Defendant Bridgham, Defendant Weber, Defendant Attorney Anderson, and Defendant Louzon, to uphold Defendant Ricci's appeal by misleading members in the School Committee Hearing;

j. Plans to cover-up and influence the School Committee, specifically by Defendants Ricci and Defendant Chariho School Department, by hiring a non-impartial lawyer for the CSC and agreement by Defendant Louzon to allow the lawyer hired by Defendant Ricci to make decisions that the CSC and Defendant Louzon should have influenced;

k. Plans to cover-up and influence RIDE to rule in favor of CRSD and the CSC appeal decisions through undisclosed ex parte meetings with the RIDE Hearing Officer.

267. Agreement by these state actor Defendants is demonstrated by direct proof, agreement in fact based on acts, and/or inference.

268. Two or more of the state actor Defendants committed acts in furtherance of the agreement and common plan or design to harm Plaintiffs.

269. Thus, in contravention of law, two or more of the state actor Defendants acting under color of law and according to government policy, custom, or practice, conspired to harm or injure Plaintiffs by depriving Plaintiffs of their rights in violation of 42 U.S.C. § 1985 and thus Plaintiffs have an action for recovery against all conspirators under 42 U.S.C. § 1985, whether named defendants or not named parties.

270. Defendant entities had in place, and state actor Defendants that are persons, followed policies, customs, patterns and practices which were the moving force in depriving Plaintiffs of their rights.

271. Defendants' policies, customs, practices, and conduct are arbitrary and capricious in violation of 42 U.S.C. § 1985.

272. Plaintiffs all seek redress for violations of Plaintiff's constitutionally protected interests and interests vested by 42 U.S.C. § 1985 committed by Defendants while acting under the color of law.

273. Plaintiff experienced the aforesaid damages as a proximate result of named Defendants and their respective agents' and co-conspirators' intentional conduct.

274. Because all Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

275. Defendants that are not persons are liable for the actions of their agents, employees, and officers.

## COUNT IV
### *Tortious Civil Conspiracy*
**(Defendants Barry Ricci, Chariho Regional School District, Ryan Bridgham, Laurie Weber, Attorney Jon Anderson, and Craig Louzon)**

276. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

277. Defendants had a duty and/or special duty to Plaintiffs to act with reasonable care and not conspire to harm Plaintiffs.

34

278. Two or more Defendants breached their duty to Plaintiffs and joined in an agreement for a common plan or design to cause financial, physical and emotional harm to Plaintiffs.

279. The agreement for the common plan or design to cause Plaintiffs harm included, but is not exclusive to the list of plans and acts listed and incorporated by reference from paragraph 266.

280. All Defendants that formed the agreement that are persons were acting within the scope of authority for their respective entities.

281. Agreement by these state actor Defendants is demonstrated by direct proof, agreement in fact based on acts, and/or inference.

282. Two or more Defendants that formed the agreement committed acts in furtherance of the agreement and common plan or design to harm Plaintiffs.

283. Plaintiffs experienced the aforesaid damages as a proximate result of named Defendants their respective agents' and co-conspirators' intentional conduct.

284. Plaintiffs have an action for recovery against all conspirators under tortious conspiracy whether named defendants or not named parties.

285. Because all Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

286. Defendant entities had in place, and state actor Defendants that are persons, followed policies, customs, patterns and practices that were the moving force in harming Plaintiffs.

287. Defendants that are not persons are liable for the actions of their agents, employees, and officers.

## COUNT V
### *Appeal of the Council's Disciplinary Decision as Arbitrary, Capricious, and Unfair*
### (Defendant Council Only)

288. Plaintiffs incorporate by reference ALL paragraphs above as if fully set forth herein.

289. RIDE was required to overturn the suspension if the action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" which has a specific meaning in administrative law and for administrative decisions such as that of RIDE including:

a. An agency's decision is arbitrary and capricious if there is a mistake of law, if the decision lacked a reasonable or rational basis, if the decision is not well reasoned, not supported by substantial evidence in the record, if the decision relied on impermissible factors, failed to consider important aspects of the problem, or offers explanations that runs counter to the evidence;

b. An agency's decision is an abuse of discretion if the fact finder based the decision on an erroneous view of the law, erroneously assessed the evidence, committed a meaningful error of judgment, ignored material factors deserving significant weight, relied upon an improper factor, or made a serious mistake in weighing the evidence; and

c. An agency's decision should be found to be arbitrary and capricious if it is not in accordance with the law due to utilization of faulty or unfair procedures that disallow a full and fair review of all the evidence.

290. In the appeal to the Council, K.Z., by and through her parents Mark and Beth Zell, asserted five groups of errors by RIDE in the hearing and decision, most with several sub-parts that included multiple errors under most categories.

291. The first group, two errors of law, were alleged which should have been reviewed de novo and included:

a. As a matter of law, failing to define "instigation," a word not defined in the disciplinary code, not defined clearly or accurately by Appellee at the hearing, and *not defined in the decision* prior to finding K. Doe had "instigated" a fight by spraying silly string in the air during "Spirit

Week" which resulted in the *decision of one student* to brutally beat K. Doe in the back of the head, with her cell phone, causing K. Doe's serious concussion; and

b.  As a matter of law for deciding, without legal basis or citation, that "specific" intent is not required for the infraction of "instigating" a fight under the disciplinary code and instead finding, without legal support, that only general intent to spray silly string at anyone sufficed to find K. Doe had "instigated" a fight simply because she was brutally attacked by Student A of Student A's own volition.

292.  The second group of errors alleged were four errors based on the failure of substantial evidence to support the key aspects of the RIDE decision, making the decision to uphold K. Doe's suspension arbitrary and capricious and an abuse of discretion because these key bases were (i) not supported by substantial evidence in the whole record, (ii) did not have a rational basis, and (iii) were not found within a reasoned analysis in the RIDE decision; these key bases for the RIDE decision for which this error was alleged included the findings that K.Z.:

a.  "[I]ntentionally sprayed" silly string;

b.  "[*I*]*n the face* of Student A [R. Doe – the perpetrator of the brutal assault and battery on K.Z.]";

c.  [w]hich was an "aggressive act" because K. Doe [K.Z.] was found to have "uttered the word bitch"; and

d.  [t]hus the "aggressive act" of spraying silly string constituted "instigation" of a "fight" because there was "mutual aggression of varying degrees."

293.  The third group of errors alleged was one error, across the record and RIDE decision, which alleged for the RIDE decision to uphold K.Z's suspension was arbitrary and capricious and an abuse of discretion because the RIDE decision neither provided any credibility determinations, nor provided any reasoning for credibility determinations or reasoning for believing one witness over the other.

294. The fourth group of errors alleged were four errors that the RIDE decision to uphold K.Z suspension was arbitrary and capricious and an abuse of discretion because the Hearing Officer erred procedurally by precluding relevant evidence regarding:

   a. [O]ther students intentionally spraying silly string and their discipline;

   b. [A] video of Student A assaulting and battering another student in the head with her phone while on a bus;

   c. [M]edical records demonstrating the seriousness of K. Doe's concussion and post-concussive syndrome which continues to date; and

   d. [E]vidence shown that the proceedings below, including the School Committee appeal, were unfair, one-sided, and not impartial.

295. The fifth and final group of errors alleged was one that RIDE erred in not considering a lesser and not reportable consequence of discipline (detention) in light of the full record, the mitigating circumstances of the suffering K.Z. had endured due to the concussion and the significant amount of school missed due to her injuries and extensive medical treatment, and in light of the fairness of the insignificance of her acts as compared to an honors student with a now significant permanent record of suspension for "fighting or instigating a fight" that must be reported to higher education institutions as K.Z. applied to college.

296. After said "deliberation," the Council decided in the oral decision to uphold the suspension of K.Z but failed to provide any reasoning as to the claim that there was no error based on "substantial evidence" as well as failed to provide any reasoning with respect to any of the five alleged groups of errors in the written May 9, 2017 Council decision. See **Exhibit A**.

297. Today, K.Z. remains aggrieved and wrongly maintains a suspension for "instigating a fight" on her record and will forever unless it is overturned by this Court.

298. Thus, K.Z., by and through her parents Mark and Beth Zell, now appeal to Federal Court under supplemental jurisdiction, alleging that the Council's decision was patently arbitrary, capricious, and unfair and thus the Council's decision should be overturned based on the standard for patently arbitrary, capricious, and unfair.

## COUNT VI
### *Tortious Assault and Battery*
**(Defendant McGinley Only)**

299. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

300. Defendant McGinley intentionally, willfully, wantonly, and maliciously struck Plaintiff K.Z. repeatedly in the head with the hard edge of a cell phone into a concussed stated.

301. Upon being struck in the head caused Plaintiff K.Z. reasonable apprehension of bodily harm and offensive contact by Defendant McGinley for all subsequent blows to her head.

302. At all times pertinent hereto, Defendant McGinley intended to cause and did cause bodily harm to Plaintiff K.Z.

303. As a direct and proximate result of Defendant McGinley's acts and omissions, Plaintiff was harmed and suffered the aforesaid damages.

304. Because Defendant McGinley's conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

## COUNT VII
### *Intentional Infliction of Emotional Distress*
**(Defendants Barry Ricci, Chariho Regional School District, Ryan Bridgham, Laurie Weber, Attorney Jon Anderson, Craig Louzon, and Rachel McGinley Only)**

305. Plaintiffs incorporate by reference ALL paragraphs above as if fully set forth herein.

306. Defendants and their agents held important, controlling roles over Plaintiff K.Z. within her school and as it related to the determination of discipline and accusations of criminal activity such as "disorderly conduct."

307. Defendants and their agents held important, controlling roles over Plaintiffs K.Z., Mark Zell, and Beth Zell during the process of the prosecution and defense of Plaintiff K.Z.'s wrongful and permanent record of suspension.

308. Defendant McGinley placed herself in the role of intentionally and without provocation seriously assaulting and battering Plaintiff K.Z. and then intentionally lying about her own acts and omissions, making her have a controlling role over Plaintiff K.Z. with respect the aforesaid acts and omissions by other Defendants and their agents.

309. Defendants' and their agents' intentional and/or reckless conduct of accusations about Plaintiff K.Z.'s unlawful behavior, assignment of discipline for "instigating a fight" when the act was an unprovoked assault with Plaintiff K.Z. as the victim with pre-determined discipline, and the outrageous defense of the unjustified discipline through four levels of corrupted appeals was extreme and outrageous conduct beyond all bounds of decency and utterly intolerable in a civilized community.

310. Defendants and their agents intended to cause all Plaintiffs severe emotional distress and/or acted with the knowledge that emotional distress would probably result from their conduct.

311. Defendants and their agents conduct did in fact cause all Plaintiffs severe emotional distress which manifested in physical injury, resulting in damages from the distress, physical discomfort, inconvenience, illness, injury, medical expenses, loss of reputation, and loss of wages.

312. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs were harmed by the breach of the standard of care and suffered the aforesaid damages.

313. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

314. Defendants are responsible for the acts and omissions of the Defendants' agents under the theory of respondeat superior.

## COUNT VIII
### *Negligence*
**(Defendants Barry Ricci, Chariho Regional School District, Ryan Bridgham, Laurie Weber, Attorney Jon Anderson, Craig Louzon, Chariho School Committee, and Rachel McGinley Only)**

315. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

316. Defendant McGinley had a duty to act with reasonable care to not cause harm to Plaintiff by avoiding an unprovoked, severe assault and battery on Plaintiff K.Z.'s head; failure to act with reasonable care resulted in long-term, permanent damage to Plaintiff K.Z. and other aforesaid injuries.

317. Defendants Ricci, Chariho School District, Bridgham, Weber, and Chariho School Committee had a duty of care to properly supervise the hallway during a known menacing day to prevent harm to Plaintiff by Defendant McGinley's assault and battery of Plaintiff.

318. Defendants Ricci, Chariho School District, Bridgham, Weber, and Chariho School Committee had a duty of care to properly evaluate Plaintiff K.Z. for a concussion prior to the four hours later when this was finally done, especially given all stated defendants knew or should have known that Plaintiff K.Z. had been assaulted and battered in the head by Defendant McGinley.

319. Defendants Ricci, Chariho School District, Bridgham, Weber, and Chariho School Committee had a duty of care to properly investigate the incident prior to disciplining Plaintiff K.Z. for what was initially investigated as a clear unprovoked assault and battery.

320. Defendants Ricci, Chariho School District, Bridgham, Weber, and Chariho School Committee had a duty of care to watch the video in the hallway prior to assigning discipline and had a duty to re-investigate and re-interview Plaintiff K.Z. following the viewing of the video which unquestionably showed a cell phone was used to beat Plaintiff K.Z. in the head and showed an unprovoked assault and battery demonstrating that Defendant McGinley's story was a lie.

321. Thus, Defendants Ricci, Chariho School District, Bridgham, Weber, and Chariho School Committee also had a duty of care to modify or remove the discipline to Plaintiff K.Z. following the viewing of the video, learning of the new evidence in the video, and learning of the concussive state Plaintiff K.Z. was in during the initial (and only) investigation involving Plaintiff K.Z.

322. Defendants Ricci, Chariho School District, Bridgham, Weber, Louzon, and Chariho School Committee further had a duty of care to not interfere with the Richmond Police investigation and the plan to arrest Defendant McGinley at school for assault and battery on the Monday following the incident.

323. These defendants certainly also had a duty to not influence the Richmond Police Department and threaten Plaintiff K.Z. with the prospect of arrest herself for "disorderly conduct" if she and her family chose to still pursue Defendant McGinley being arrested then, at that point, not for assault and battery, but also for "disorderly conduct."

324. Defendants Ricci, Chariho School District, Bridgham, Weber, moreover had a duty of care to properly investigate the incident *after* assigning discipline to Plaintiff K.Z. once both the aforesaid events changed with respect to Defendant McGinley's arrest.

325. Defendants Ricci, Chariho School District, Bridgham, Weber, and Attorney Anderson had a duty to use reasonable care to bring to light and review K.Z.'s discipline after new evidence came to light about the fact that Defendant McGinley beat K.Z. in the head with a cell phone and that Defendant McGinley had a modus operandi of expressing aggression by beating kids in the head with her cell phone.

326. Defendants Ricci, Chariho School District, Bridgham, Weber, Louzon, and Attorney Anderson had a duty to use reasonable care to not interfere with the School Committee hearing to influence

42

the outcome to uphold Defendant Ricci's appeal decision and a duty of care in conducting the school committee hearing so as to ensure the truth was represented and a fair result was reached.

327. Defendants Ricci and Chariho School District had a duty to use reasonable care to not interfere with the impartiality of the RIDE hearing by having an ex parte meeting with the hearing officer.

328. All Defendants all breached the aforesaid respective duties by their respective acts and omissions incorporated by reference in ALL preceding paragraphs as if fully alleged herein.

329. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs were harmed by the breach of the standard of care and suffered the aforesaid damages.

330. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

331. Defendants are responsible for the acts and omissions of the Defendants' agents under the theory of respondeat superior.

## COUNT IX
### *Negligent Hiring, Training, Supervision and Retention*
**(Defendants Barry Ricci, Chariho Regional School District, and Chariho School Committee Only)**

332. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

333. Defendants owed a duty of care to hire, train, supervise and retain competent, properly qualified, and well-performing employees, servants, agents and/or contractors in Chariho Regional High School.

334. Defendants breached its duty to in the following non-exclusive ways by hiring and retaining employees, servants, agents, and contractors that were not competent, not properly qualified, and poor-performing to competently:

    (a)    supervise the hallway during a known morning of mayhem which resulted in the unsupervised opportunity for Defendant McGinley to perpetrate an unprovoked, serious

assault and battery of Plaintiff K.Z. in the head resulting in a serious concussions and permanent injury;

(b)   make reasonable and proper decisions related to identifying a clear, unprovoked assault and battery by Defendant McGinley against K.Z.;

(c)   investigate the false allegations against Plaintiff K.Z. spraying Defendant McGinley "in the face," calling Defendant a "bitch before" spraying silly string, "instigating a fight," timely watching the video, and generally finding out what really happened;

(d)   make reasonable and proper decisions related to competently and promptly evaluating Plaintiff K.Z. for a concussion until approximately four hours after the reported assault and battery to Plaintiff K.Z.'s head;

(e)   to make competent and honest decisions to not search for one-sided social media evidence against K.Z. after she was the victim of an assault;

(f)   to make competent and honest decisions to not interfere with the arrest of Defendant McGinley by the Richmond Police Department;

(g)   make reasonable and proper decisions to competently and properly re-investigate the incident and modify the assigned suspension *after* new evidence became known based on viewing the video, based on the knowledge that a cell phone was used to assault and batter Plaintiff K.Z., based on the knowledge that Defendant McGinley used a modus operandi to display aggression by beating kids in the head with her cell phone, based on the knowledge that Plaintiff K.Z. was never interviewed prior to Defendant Ricci's decision, based on the knowledge that K.Z. was *only ever* interviewed while in a concussed state, and after new evidence that no student could confirm the "bitch" comment occurred prior to the unprovoked assault and battery;

44

(h) to make competent and honest decisions to not interfere with impartial hearings with the CSC and RIDE, to not hold ex parte meetings with the RIDE hearing officer, and to represent the events and evidence accurately in all four appeals of Plaintiff K.Z.'s wrongful suspension; and

(i) to make competent and honest decisions to not form a conspiracy to cover-up all of the wrongful acts alleged in this complaint.

335. Defendants breached its duty to in the following non-exclusive ways by failing to train and supervise employees, servants, agents and/or contractors for the same purposes as stated in and incorporate by reference from paragraph 334.

336. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' conduct.

337. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

338. Defendants are vicariously responsible and responsible for the acts and omissions of the Defendants' agents under the theory of respondeat superior.

## COUNT X
### *Defamation Per Se*
### (All Defendants)

339. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

340. Defendants and their agents published and republished, orally and/or in writing, false statements that Plaintiff K.Z. sprayed Defendant McGinley "in the face" with silly string, called Defendant McGinley a "bitch before" spraying silly string, that K.Z. "instigated a fight," and that K.Z. committed the crime of "disorderly conduct," none of which were true statements.

341. Defendants and their agents published and republished, orally and/or in writing, the aforesaid false statements innumerable times.

342. Defendants and their agents published and republished, orally and/or in writing, with the knowledge that the statements were untrue, in reckless disregard of the truth, and/or in negligent disregard of the truth of the statements.

343. The aforesaid statements were published to third parties.

344. Defendants and their agents published these statements in the course of performing their duties while employed by their various government entities.

345. Defendants and their agents that published, republished, and received the statements in oral or written form did not have a 'need to know.'

346. These false statements are of the type that a reasonable person would find to be of the character that would harm Plaintiff's K.Z.'s reputation, standing in the community.

347. Defendants' agents published the false statements despite foreseeability that such published false statements would cause economic and reputational harm to and damage to Plaintiff K.Z, would lower the estimation of Plaintiff K.Z. in the community, and would be understood by the party receiving publication of the false statements as such a statement that would harm Plaintiff K.Z.

348. Parties receiving the publication did, in fact, understand the publication of false statements to be the type that would in fact actually harm Plaintiff K.Z.'s reputation and cause damage to Plaintiff K.Z.

349. Such false published statements related to a criminal offense of "disorderly conduct" constitutes defamation/slander *per se* so presumed damages are applicable.

350. Plaintiff experienced the damages aforesaid as a proximate result of Defendants and their agents' intentional conduct.

351. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

352. Defendants are responsible for the acts and omissions of the Defendants' agents under the theory of respondeat superior.

## COUNT XI
### *Failure to Accommodate a Person with a Disability in Violation Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794*
### (Chariho Regional School District and Chariho School Committee)

353. Plaintiffs incorporate by reference ALL paragraphs above as if fully set forth herein.

354. Defendant Chariho School Department is the recipient of federal financial assistance in the form of federal grants for programs and as such Section 504 protections are applicable.

355. Plaintiff K.Z. is a disabled individual in that: (1) she has a physical or mental impairment with substantial limits of one or more of her major life activities, (2) has a record of such impairment and (3) is regarded as having such an impairment.

356. Specifically K.Z. had disabilities known to the Defendants including a head injury, a migraine condition, an anxiety condition, and a seizure disorder.

357. Plaintiff K.Z. was a qualified person with a disability and entitled to the protections and right to accommodation as provided for in the ADA and Section 504.

358. Defendants were therefore required to make reasonable accommodations for Plaintiff K.Z.

359. Plaintiff K.Z. requested a reasonable accommodation to serve her suspension at home versus at school, because of her protected disabilities.

360. Defendants unreasonably denied the requested accommodation, which is an act of disability discrimination in violation of the ADA and Section 504 of the Rehabilitation Act.

361. Plaintiff experienced the damages aforesaid as a proximate result of Defendants and their agents' intentional conduct.

362. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

363. Defendants are responsible for the acts and omissions of the Defendants' agents under the theory of respondeat superior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

a. Order judgment for Plaintiffs against Defendants on all Counts of the Complaint;

b. Declare that the practices detailed in this Complaint are unlawful and order prospective declaratory relief;

c. Reverse the Council's decision upholding K.Z.'s suspension presently on her permanent record;

d. Order, for all counts applicable, prospective injunctive relief as deemed just and proper by this Court;

e. Order, for all applicable Counts, that Defendants make Plaintiffs whole by awarding compensation to make Plaintiffs whole for retrospective and prospective damages, where appropriate, to make Plaintiffs whole with respect to monetary damages incurred;

f. Order, for all applicable Counts, that Plaintiffs be awarded retrospective and prospective damages, where appropriate, in an amount of money which will fairly compensate Plaintiffs for physical injury, permanent damage due to physical injury, mental anguish, emotional pain and suffering, damage to Plaintiffs' reputations, loss of standing in the community, and other damages incurred;

g. Order, for all applicable Counts, that the Defendants pay Plaintiffs' costs and reasonable attorney's fees resulting from this action under 42 U.S.C. § 1988, R.I. Gen. Law 42-92-1, *et seq.,* and/or upon other statutory or common law bases;

h. Order, for all applicable Counts, that the Defendants pay punitive or exemplary damages, as appropriate to punish Defendants for their malicious conduct, conduct that shocks the conscience, recklessness conduct, and/or callous indifference to the statutorily and/or common law protected rights of Plaintiffs;

i. Order, for all applicable Counts, that Defendants pay post-judgment interest where appropriate and allowable by law;

j. Order, for all applicable Counts, that Defendants pay pre-judgment interest, including interest for all damages awarded to Plaintiffs from the date the cause of action accrued, where appropriate and allowable by law;

k.Retain jurisdiction of this action to ensure full compliance; and

l. Order, for all Counts, such other relief to Plaintiffs as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

### PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

June 6, 2017

Respectfully Submitted,
MARK ZELL and BETH ZELL, individually
and on behalf of K.Z., a minor,
By their attorney,

 /s/ Paige Munro-Delotto 
Paige Munro-Delotto, Ph.D., Esq. #9291
Munro-Delotto & Sheehan, LLC
400 Westminster Street, Ste. 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com

49