UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
MARK ZELL, and BETH ZELL,               )
individually and on behalf of K.Z.,     )
a minor,                                )
                                        )
          Plaintiffs,                   )   C.A. No. 17-277 WES
      v.                                )
                                        )
BARRY RICCI, alias, Superintendent of   )
Chariho Regional School District in his )
individual and official capacities;     )
CHARIHO REGIONAL SCHOOL DISTRICT, by    )
and through its Superintendent, Barry   )
Ricci, alias; RYAN BRIDGHAM, alias, Dean)
of Students Chariho High School, in his )
individual and official capacities;     )
LAURIE WEBER, alias, Former Principal of)
Chariho High School in her individual   )
and official capacities; JON ANDERSON   )
Esq., alias, Chariho Regional School    )
District Attorney in his individual and )
official capacities; THE CHARIHO SCHOOL )
COMMITTEE, by and through its Chairperson,)
Sylvia Stanley, alias, in her official  )
capacity; CRAIG LOUZON, alias, in his   )
individual and official capacity as the )
former Chair of the Chariho School      )
Committee; RACHEL MCGINLEY, alias, in her )
individual capacity; THE RHODE ISLAND   )
DEPARTMENT OF EDUCATION, by and through  )
its Commissioner, Ken Wagner, alias;    )
KEN WAGNER, alias, in his official and  )
individual capacity; THE RHODE ISLAND   )
COUNCIL OF ELEMENTARY AND SECONDARY     )
EDUCATION, by and through its Chair     )
Daniel P. McConaghy, alias; DANIEL      )
P. MCCONAGHY, alias, in his individual  )
and official capacity; JOHN/JANE DOES   )
1-20; and JOHN DOE GOVERNMENT           )
ENTITIES/BODIES 1-10,                   )
                                        )
          Defendants.                   )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

The case comes before the Court on multiple motions: (1) Rhode Island Department of Education ("RIDE") and Ken Wagner's ("Commissioner Wagner") (collectively, "RIDE Defendants") Motion To Dismiss (ECF No. 12); (2) Rhode Island Council of Elementary and Secondary Education ("Council") and Daniel P. McConaghy's ("Chair McConaghy") (collectively, "Council Defendants") Motion To Dismiss (ECF No. 14); (3) Jon Anderson's Motion To Dismiss (ECF No. 22); (4) Rachel McGinley's Motion To Dismiss (ECF No. 26); (5) Ryan Bridgham ("Dean Bridgham"), Chariho Regional School District ("CRSD"), Chariho School Committee ("Committee"), Craig Louzon ("Chairperson Louzon"), Barry Ricci ("Superintendent Ricci"), and Laurie Weber's ("Principal Weber") (collectively, "Chariho Defendants") Motion To Dismiss (ECF No. 27); and (6) Plaintiffs' Motion for Supplemental Jurisdiction and Notice of Family Court Dismissal (ECF No. 51).

I. Background

"I wish we could all get along like we used to in middle school. I wish I could bake a cake filled with rainbows and smiles and everyone would eat and be happy."[1] Although the circumstances leading to this case started out with rainbows and

_____

[1] Mean Girls (Paramount Pictures 2004).

smiles, it wasn't that way for long; it was high school, after all. To be certain, it was October 16, 2015, the Friday of the annual "Spirit Week" at Chariho High School ("CHS"): a day marked by "mayhem" and "school-sponsored bad decisions" leading up to the "big homecoming football game."[2] (Pls.' Second Am. Compl. ("Compl.") ¶¶ 39, 41-43, ECF No. 41.) In years past, for example, the high school permitted "actual hay and live animals" to fill the halls. (Id. ¶ 43.) The absence of live animals roaming the halls this year didn't make it any less of a zoo.

The day began early with the morning procession. (Id. ¶ 39.) Senior students sporting togas and armed with silly string lined up outside and prepared to march through the halls while spraying each other and underclassman who occupied the halls in witness and participation of the fun-filled event. (Id. ¶¶ 40-41, 46.) One such student populating the halls was Plaintiff, K.Z., a then-junior field-hockey player who donned her school spirit in her uniform. (Id. ¶¶ 37, 48-49.) K.Z., like many other students who watched the procession, came prepared with her own can of silly string. (Id. ¶ 48.)

As seniors paraded through the halls, K.Z., who had been standing among a group of friends on the right side of the

_____

[2] The Court recounts the facts, as it must, in the light most favorable to Plaintiffs, as the nonmoving parties. Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 58 (1st Cir. 2018).

hallway, sprayed her silly string in the air "indiscriminately" toward various other students passing her by. (Compl. ¶¶ 49, 53.) Many other students sprayed silly string, too, both through the air and directly at other students, including in their faces at close range. (Id. ¶ 54.) Silly string had been flying from all directions.

Still standing among her friends, K.Z. took aim at a group of toga-sporting students positioned some distance down and across the hallway. (Id. ¶¶ 50, 53, 60-66.) Her silly string rained down on a group of two or more girls, which included Defendant Rachel McGinley. (Id. ¶¶ 66-69.) While K.Z. had her back turned and still conversing with her friends, McGinley began sprinting toward her. (Id. ¶¶ 71-74.) With her cell phone in hand and her right arm raised over K.Z.'s head, McGinley used the hard edge of her phone to land several "hammer blows" to K.Z.'s head. (Id. ¶¶ 77-80.) K.Z. fell forward. (Id. ¶ 82.) With her cell phone in tow, McGinley took a victory lap, laughing and smiling. (Id. ¶ 84.) K.Z., still confused and feeling head pain, struggled off to class, where she remained only shortly when Dean Bridgham called K.Z. to his office. (Id. ¶¶ 86-87.) When there, K.Z. had difficulty comprehending Dean Bridgham's comments, although K.Z. did understand that McGinley informed school officials that she had

4

struck K.Z. in the head. (Id. ¶ 88.) After asking very few questions, none of which concerned K.Z.'s wellbeing, Dean Bridgham sent K.Z. back to class. (Id. ¶¶ 90-92.) K.Z. was called back to Dean Bridgham's office shortly after, where Principal Weber was also present.[3] (Id. ¶¶ 7, 95-96.) After little questioning, Dean Bridgham informed K.Z. that she would face a one-day suspension for "fighting (or instigating a fight)" because the school concluded she had sprayed silly string in McGinley's face and called her a "bitch." (Id. ¶¶ 104-05, 111.) McGinley also received a one-day suspension for the same offense. (Id. ¶ 112.)

Visibly shaken and deeply perturbed by the news of her suspension, K.Z. called her father, Plaintiff Mark Zell. (Id. ¶ 115.) K.Z. was then directed to wait in another room where other students had been working. (Id. ¶ 116.) While there, friends of McGinley taunted K.Z. for McGinley "beat[ing] [her] up." (Id. ¶ 118.) At about 11:00 a.m., Mr. Zell arrived at CHS and inquired whether anyone had evaluated K.Z. for a concussion, to which school officials agreed "would be a good idea."[4] (Id.

---

[3]   Principal Weber attended one or both of K.Z.'s meetings with Dean Bridgham. (Compl. ¶ 96.)

[4]   Before that point, no teacher or other school official had asked K.Z. about her head injury or suggested that her injury be medically evaluated. (Compl. ¶ 90.)

¶¶ 120-21.) The school nurse then evaluated K.Z. and immediately concluded K.Z. was likely concussed; a hospital confirmed that K.Z. had a "serious concussion" shortly thereafter. (Id. ¶¶ 122-26.)

Later that evening, Mr. and Mrs. Zell visited the Richmond Police Department ("PD") to file a police report "for the assault and battery of their minor daughter." (Id. ¶ 127.) An officer first told them that McGinley would be immediately arrested; however, without divulging its reasoning, the PD eventually informed Mr. and Mrs. Zell that the School Resource Officer would arrest McGinley at school the following Monday, and then that the PD would not arrest McGinley at all unless K.Z. was also arrested for "Disorderly Conduct."[5] (Id. ¶¶ 128-29, 132-33.) Mr. and Mrs. Zell pressed school officials as to why McGinley would not be arrested, and their response was consistent with the PD's statement that she could only be arrested for "disorderly conduct" if K.Z., too, was arrested. (Id. ¶¶ 139-40.) Not satisfied with this response and because they feared "unjustified criminal charges against K.Z.," Mr. and

---

[5] The PD's pivot in plans with respect to K.Z. and McGinley followed an email exchange between the PD Chief and Superintendent Ricci that discussed Mr. Zell or his allegations "in a less than favorable light." (Compl. ¶¶ 130-31.)

Mrs. Zell dropped criminal charges against McGinley. (<u>Id.</u> ¶ 141.)

From this point, however, Mr. and Mrs. Zell launched a vigorous challenge to the school's decision to suspend K.Z. First, while K.Z. was at home recovering for about six days, Mr. Zell appealed her suspension to Superintendent Ricci and "wrote a detailed accounting of events as reported by K.Z., her friends, and the video." (<u>Id.</u> ¶¶ 142-44.) Although Superintendent Ricci asked to speak with K.Z., he wrote his decision that upheld the suspension before ever speaking to her directly.[6] (<u>Id.</u> ¶¶ 145, 147.)

Next, Plaintiffs appealed the decision of Superintendent Ricci to the Committee. (<u>Id.</u> ¶ 154.) At the Committee hearing on or around February 23, 2016, Defendant Attorney Anderson represented CRSD and Superintendent Ricci, "prosecuting the upholding of K.Z.'s suspension." (<u>Id.</u> ¶¶ 157, 167.) The hearing was conducted by another attorney for the Committee, who Superintendent Ricci hired. (<u>Id.</u> ¶ 167.) During Attorney Anderson's presentation, he argued that "a cell phone is a teenage girl's most prized possession" never to be used as a weapon despite knowing that McGinley indeed struck K.Z. with her

---

[6] Mr. Zell requested that Superintendent Ricci wait to render his decision until speaking with K.Z., after she returned to school fully recovered. (Compl. ¶ 146.)

cell phone, while only presenting portions of the video displaying the altercation between K.Z. and McGinley.[7] (See id. ¶¶ 168-70.) The attorney presiding over the Committee's hearing precluded Plaintiff from showing another video that allegedly displayed McGinley striking another student in the head with her cell phone on a school bus. (Id. ¶¶ 173-74.) In a decision signed by Chairperson Louzon, the Committee upheld K.Z.'s suspension. (Id. ¶¶ 180-81.)

Following the Committee's decision, Plaintiffs hired present counsel and took another appeal to RIDE. (Id. ¶ 182.) RIDE held a hearing in the summer of 2016, over which a RIDE Hearing Officer presided. (Id. ¶¶ 183, 192.) The hearing "included two full days with over ten (10) witnesses" and "resulted in nearly a foot of transcripts." (Id. ¶ 183.) One such witness was K.Z., who admitted to saying "bitch" after McGinley struck her head. (Id. ¶ 185.) K.Z.'s former best friend, A. Doe, also testified that K.Z. "yelled 'bitch' before spraying silly string" at McGinley. (Id. ¶ 184.) A. Doe, whose truthfulness was called into doubt at the RIDE hearing, also recalled that K.Z. had asked whether she should have sprayed

---

[7] Attorney Anderson omitted parts of the video displaying "K.Z. spray[ing] silly string in the air without incident, . . . the other students spraying silly string, and . . . K.Z. being sprayed with silly string directly in the face." (Compl. ¶ 170.)

McGinley before she did so. (Id. ¶¶ 186-87.) Dean Bridgham also "explain[ed] that there was a lack of some needed policy or some related failure by the school district to handle the situation, including K.Z.'s concussion." (Id. ¶ 188.) Dean Bridgham explained that he notified Superintendent Ricci of this "failure," but he was cutoff before continuing his testimony. (Id. ¶¶ 189-92.) The RIDE hearing also included extensive cross examination by Plaintiffs of the various witnesses, and Plaintiffs also presented an expert witness. (See id. ¶¶ 194-95.) Despite the length of the hearing and the amount of witnesses produced, the decision that came out of the hearing was, to the Plaintiffs' way of thinking, "shockingly short" and omitted citation to much of Plaintiffs' evidence. (Id. ¶ 198.)

During a break at the RIDE hearing, the Hearing Officer and Superintendent Ricci were witnessed alone in a room "talking with the video playing as [Superintendent] Ricci pointed out parts of the video to the RIDE Hearing Officer ex parte." (Id. ¶ 196.) This ex parte meeting was never authorized by or disclosed to Plaintiffs. (Id. ¶ 197.)

Nevertheless, Plaintiffs persisted. Viewing RIDE's decision as plagued with error (five specifically), (Compl. ¶¶

290-95), Plaintiffs appealed to the Council.[8]  (Id. ¶ 200.)  In preparation for their hearing, the Council received the full record encompassing "nearly a foot-high stack of transcripts," Plaintiffs' forty-five page (single spaced) appeal brief infused with hundreds of record and legal citations and allegations of error, CRSD's eighteen-page opposition brief, and Plaintiffs' thirty-six-page reply brief.  (Id. ¶¶ 207-08.)  After approximately a twenty-minute argument by Plaintiffs' counsel, "a few comments by" CRSD's attorney, and a brief, five-minute deliberation,[9] the Council delivered an oral decision upholding the decision below.  (See id. ¶¶ 209, 212.)  The oral decision was followed by a five-page written decision on May 9, 2017, which affirmed K.Z.'s suspension and rejected each of Plaintiffs' five averments of error.  (Id. ¶¶ 214-15.)

---

[8]  While awaiting the Council's review, CHS required K.Z. to serve her "in-school suspension." (Compl. ¶ 201.)  Before that time, K.Z. requested an accommodation under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act to serve her suspension at home, rather than at school, but Plaintiff's request was denied.  (Id. ¶¶ 202, 205.)

[9]  During their deliberation, members of the Council were overheard "laughing loudly and discussing matters irrelevant to the proceeding." (Compl. ¶ 210.)

This eleven-count, forty-nine-page Complaint followed. And then came Defendants' various motions to dismiss. On February 1, 2018, the Court heard oral argument in this matter.

II. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." Riggs v. Curran, 863 F.3d 6, 10 (1st Cir. 2017) (quoting Guadalupe-Báez v. Pesquera, 819 F.3d 509, 514 (1st Cir. 2016)). However, "to survive a Rule 12(b)(6) motion . . . a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true . . . .'" Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, although "the pleading standard . . . does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555).

A similar standard is applied when the Court construes a motion to dismiss under Rule 12(b)(1). Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995). The Court, in its review, remains cognizant that "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993).

III. Discussion

A. Standing of Mark and Beth Zell ("[They don't] even go here")[10]

At the outset, Plaintiffs (parents) Mark and Beth Zell lack standing as to any of their claims. This includes claims asserted on their own behalf and those brought in a representative capacity pursuant to Rule 17(c) of the Federal Rules of Civil Procedure.

Starting with the latter, it is now undisputed that Plaintiff K.Z. reached the age of majority prior to Plaintiffs' filing the Second Amended Complaint on November 24, 2017.[11] See, e.g., Lausin ex rel. Lausin v. Bishko, 727 F. Supp. 2d 610, 625 n.5 (N.D. Ohio 2010) ("[W]hen [the minor plaintiff] became

---

[10]  Mean Girls, supra note 1.

[11]  Counsel for Plaintiffs conceded this point during argument before the Court on February 1.

18 years old, [her mother] lost her standing to bring this lawsuit in a representative capacity on behalf of [her daughter].”); see also Vandiver v. Hardin Cty. Bd. of Educ., 925 F.2d 927, 930 (6th Cir. 1991) (holding parents lost standing to bring claims in representative capacity to enforce son's rights when son turned eighteen, the age of legal majority under state law); cf. R.I. Gen. Laws § 15-12-1(a) (“[A]ll persons who have attained the age of eighteen (18) years shall be deemed to be persons of full legal age.”).

Plaintiffs' Mark and Beth Zell's claims on their own behalf also fall away for lack of standing. First, in Count I, they suggest a procedural-due-process violation premised on the assertion that they maintained a “property interest in not being deprived of their money without due process of law.” (Compl. ¶ 229.) Plaintiffs' averment that they spent money and other resources to prosecute this lawsuit does not implicate a recognized property interest under the Due Process Clause. Indeed, “the expense of defending against a lawsuit is not itself a protectable property interest.” Powell v. Fujimoto, 119 F. App'x 803, 806 (7th Cir. 2004); see also Workman v. Jordan, 32 F.3d 475, 480 n.4 (10th Cir. 1994) (“These incidental losses do not give rise to an independent protected property interest.”).

13

Try as they might to allege a separate and distinct injury, the remainder of Mark and Beth Zell's allegations are entirely derivative of their daughter's. Yet one person lacks standing to advance the constitutional rights of another. See United States v. Raines, 362 U.S. 17, 21 (1960); see also Pittsley v. Warish, 927 F.2d 3, 8 (1st Cir. 1991), abrogated on other grounds by Martinez v. Cui, 608 F.3d 54, 63-64 (1st Cir. 2010) ("[O]nly the person toward whom the state action was directed, and not those incidentally affected, may maintain a § 1983 claim.").

Mark and Beth Zell lack standing as to each of their claims (Counts I, II, and III). Therefore, the Court dismisses Plaintiffs' Complaint entirely as to Mark and Beth Zell. Accordingly, the analysis that follows discusses Plaintiffs' claims only as they pertain to Plaintiff K.Z, on her own behalf.[12]

B. Plaintiff's Constitutional Claims

1. Count I

Count I fails to state a claim. Here, pursuant to 42 U.S.C. § 1983, Plaintiff alleges procedural-due-process violations under the Fifth and Fourteenth Amendments of the

---

[12] To this end, hereinafter, the Court refers to a singular "Plaintiff."

United States Constitution and Article 1, Section 2 of the Rhode Island Constitution against all Defendants but McGinley.[13] (Compl. 27.)

Plaintiff avers that Defendants denied her "liberty interest in not being deprived of her reputation, a right to not endure 'stigma' plus a right not to be deprived of present or future educational, scholarship, and job opportunities without procedural due process of law." (Id. ¶ 228.) Specifically, Plaintiff alleges that Defendants denied her procedural due process by "wrongly accusing Plaintiff K.Z. of instigating a fight, assigning a suspension permanently on her record, and when appealed, . . . depriv[ing] Plaintiffs of proper notice, opportunity to be heard, and/or a fair hearing with an impartial decision maker" in each layer of appeal. (Id. ¶ 231.)

The Court need not even delve into whether Plaintiff states a claim for a violation of procedural due process, i.e., whether Plaintiff's claim implicates a viable liberty interest of which Plaintiff could be deprived, because the answer to a separate question, "what process is due," see Morrissey v. Brewer, 408 U.S. 471, 481 (1972), is fatal to Plaintiff's claim. That is,

---

[13] The Court's analysis of Plaintiff's claims under the Rhode Island Constitution mirrors its discussion of Plaintiff's federal-constitutional claims. See Pelland v. Rhode Island, 317 F. Supp. 2d 86, 97 (D.R.I. 2004).

as a matter of law, based on the punishment K.Z. received – a one-day, in-school suspension – it is clear that she received significantly more process than she was due.

No inference that this Court could draw could rescue Plaintiff from the ineluctable conclusion that she received constitutionally adequate process. Indeed, it is baffling, based on how much process Plaintiff (and her parents) received, that she could, with a straight face, assert a procedural-due-process violation in this Court. The process Plaintiff received, as outlined by her complaint, was as follows. Dean Bridgham met with K.Z. with respect to the incident that Defendant McGinley brought to the attention of administration prior to making any discipline determination. (Compl. ¶¶ 87-89, 91-92.) Indeed, Dean Bridgham interviewed K.Z. twice. (Id. ¶ 95.) During the first meeting, Dean Bridgham informed K.Z. that McGinley had informed school officials that "she had hit K.Z. in the head." (Id. ¶ 88.) Principal Weber was also present in at least one of Dean Bridgham's meetings with K.Z. (Id. ¶ 96.) Then, Plaintiff was allowed to challenge her discipline in an appeal before Superintendent Ricci, who was provided with additional evidence including "a detailed accounting of events as reported by K.Z., her friends, and the video" composed by Mr. Zell. (Id. ¶ 144.) Plaintiff was then permitted another layer

16

of process: an evidentiary hearing before the Committee, where she was represented by counsel, who questioned witnesses and presented evidence. (Id. ¶¶ 154, 168-74.) Plaintiff then participated in a hearing before the RIDE Hearing Officer, where more than ten witnesses (including an expert witness for Plaintiff) testified over the course of two full days. (Id. ¶¶ 183, 195.) The result of this hearing was nearly one foot of transcripts. (Id. ¶ 183.) But that's not all. Plaintiff took another appeal to the Council, where there was another hearing, exhaustive briefing, and another written decision. (Id. ¶¶ 200, 207-08.)

Sufficient procedural due process requires "not an 'elaborate hearing before' a neutral party, but simply 'an informal give-and-take between student and disciplinarian' which gives the student 'an opportunity to explain his version of the facts.'" Gorman v. Univ. of R.I., 837 F.2d 7, 16 (1st Cir. 1988) (quoting Ingraham v. White, 430 U.S. 651, 693 (1977) (White, J., dissenting)). Plaintiff received more process than the Constitution dictates. She was entitled to "notice and an opportunity to be heard," id. at 12, before discipline was imposed, and she received that plus numerous full-blown hearings replete with neutral decision-makers, full adversarial hearings, and the opportunity to fully argue her case. Therefore, her

procedural-due-process claim (Count I) fails at the threshold. See id. at 12-13; cf. Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 686 (1986) ("Two days' suspension from school does not rise to the level of a penal sanction calling for the full panoply of procedural due process protections applicable to a criminal prosecution.").

2. Count II

In Count II, pursuant to 42 U.S.C. § 1983, Plaintiff asserts that, unlike "similarly situated students at Chariho High School [who] were not singled out," Defendants singled out K.Z. for "arbitrary classification and differential treatment" in violation of her right to equal protection. (Compl. ¶¶ 249-53.) More specifically, without identifying such policies,[14] Plaintiffs blame "arbitrary and capricious" policies, customs, patterns, and practices allegedly in place that infringed Plaintiff's equal-protection rights. (Id. ¶¶ 254-55.) This

---

[14] This alone dooms Plaintiff's claim. "[A] plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" Haley v. City of Bos., 657 F.3d 39, 51 (1st Cir. 2011) (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997)). "Such a plaintiff must 'identify a municipal "policy" or "custom" that caused the plaintiff's injury.'" Id. (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).

claim is directed toward all Defendants but McGinley.  (Id. at 30.)

"[T]he proponent of the equal protection violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007) (citing Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)).  Here, Plaintiff's well-pled complaint simply has not satisfied this test.  See Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 67 (1st Cir. 2004) (making plain that the First Circuit has not abandoned its oft-cited principle that "notice pleading notwithstanding, Rule 12(b)(6) is not entirely a toothless tiger." (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989))).

Plaintiff's haphazard approach to pleading that she was "similarly situated" to a wide swath of students who participated in Spirit Week cannot suffice, even at the motion-to-dismiss stage.  (Compl. ¶¶ 250-51.)  In any event, none of the students that Plaintiff points to are sufficient comparators to Plaintiff because each of the students differs in several "relevant respects."  See Barrington Cove Ltd. P'ship v. R.I.

Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001); see also Wyrostek v. Nash, 984 F. Supp. 2d 22, 30-31 (D.R.I. 2013) (prohibiting "comparison of quaffles to snitches"). For instance, Plaintiff identifies "students who participate in 'spirit week' and 'spray[ed] silly string both in the air and directly at classmen,' especially those who sprayed 'silly string' 'directly at other students at close range and "in their faces,"' those students 'yelling profanities or other inappropriate words at one another,' and those students who participated in 'shows of aggressive bantering.'" (Pls.' Mem. of Law in Supp. of Pls.' Obj. to Chariho Defs.' Mot. To Dismiss ("Pls.' Obj. to Chariho Mot.") 55, ECF No. 39-1 (quoting Compl. ¶¶ 46, 54-56.)). The breadth of Plaintiff's comparison demonstrates its dearth; none of the other students Plaintiff references are sufficiently similar to her. And even at the motion-to-dismiss stage, the Court is not required to accept hook, line, and sinker Plaintiff's claim that she sufficiently pleads membership in a "class of one." Wyrostek, 984 F. Supp. 2d at 31. Count II therefore fails.

3. Count III

Here, Plaintiff suggests that, "in contravention of law, two or more of the state actor Defendants acting under color of law and according to government policy, custom, or practice,

20

conspired to harm or injur[e] Plaintiffs by depriving Plaintiffs
of their rights in violation of 42 U.S.C. § 1985." (Compl. ¶
269.) Plaintiff alleges that all Chariho Defendants and
Attorney Anderson participated in a civil conspiracy in
deprivation of Plaintiff's equal-protection and due-process
rights. This unlawful agreement included, Plaintiff suggests,
plans to, among other things: improperly investigate and cover
up "an unprovoked assault and battery by Defendant McGinley
against Plaintiff K.Z.," influence the PD to delay arrest or not
arrest Defendant McGinley, or arrest Plaintiff K.Z. along with
her, and taking various measures to influence the Committee and
RIDE to rule against K.Z. (Id. ¶ 266.)

Plaintiff's claim on this score is not cognizable as a
matter of law. With respect to the equal-protection component,
even assuming Plaintiff could claim to be a "class of one," her
"membership in that class is 'not entitled to the kind of
special protection which would make § 1985(3) applicable to
Plaintiff['s] claim.'" Royal Oak Entm't, LLC v. City of Royal
Oak, 205 F. App'x 389, 399 (6th Cir. 2006) (alteration in
original) (quoting McGee v. Schoolcraft Cmty. Coll., 167 F.
App'x 429, 436 (6th Cir. 2006) ("The group of individuals . . .
may be a relatively discrete minority, but certainly it is
neither based on inherent personal characteristics nor

21

traditionally the subject of special protection under the Equal Protection Clause.")). Neither the Supreme Court nor the First Circuit has addressed whether a "class of one" theory can undergird a claim brought pursuant to 42 U.S.C. § 1985(3). (Pls.' Obj. to Chariho Mot. 60-61.) And Plaintiff neglects to cite a single case – from any court - to support the idea that such a claim is cognizable. See Royal Oak Entm't, 205 F. App'x at 399 ("Not surprisingly, Plaintiffs provide no authority whatsoever for this claim, and we reject it."); see also Martone Place, LLC v. City of Springfield, No. 16-cv-30170-MAP, 2017 WL 5889222, at *4, *18-19, *19 n.19 (D. Mass. Nov. 29, 2017) (dismissing conspiracy claim premised on class-of-one theory because "the complaint is devoid of allegations of 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus'" (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996))).

Furthermore, the aspect of Plaintiff's claim pertaining to the Due Process Clause must fail because the underlying due process claim fails. That is, Plaintiff cannot allege a conspiracy to violate her constitutional rights without a plausible violation of those underlying rights. See Novotny v. Tripp Cty., 664 F.3d 1173, 1180 (8th Cir. 2011) ("[B]ecause [plaintiff] has not adequately shown any underlying

22

constitutional violations, his civil conspiracy claim must also fail." (citation omitted)); <u>Sow v. Fortville Police Dep't</u>, 636 F.3d 293, 305 (7th Cir. 2011) ("[T]he absence of any underlying violation of Plaintiff's rights precludes the possibility of Plaintiff succeeding on a conspiracy claim." (citation omitted)). Thus, Count III is dismissed.

   4. Count XI

   In this Count, which only pertains to CRSD and the Committee, Plaintiff alleges a failure to accommodate a person with a disability in violation of Title II of the ADA, 42 U.S.C. § 12132 <u>et seq</u>., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. (Compl. 47.) Specifically, Plaintiff alleges that these defendants unreasonably denied Plaintiff's request for a reasonable accommodation to serve her suspension at home rather than at school, because of her alleged disability. (Compl. ¶¶ 359-60.) Plaintiffs suggest K.Z. was disabled, with conditions known to CRSD and the Committee including a head injury, migraine condition, anxiety, and a seizure disorder. (<u>Id.</u> ¶ 356.)

   Plaintiff's ADA claim falls short of stating a plausible claim. Insofar as Plaintiff asserts that her alleged disability required her to serve her suspension at home rather than (one-day) in-school, the ADA and Rehabilitation Act are not

implicated. See Mason v. Bd. of Educ., No. WMN-10-3143, 2011 WL 89998, at *3 (D. Md. Jan. 11, 2011) (dismissing Plaintiffs' claim under Title II of the ADA and Section 504 of the Rehabilitation Act because "neither a five-day suspension nor an in-school detention implicate[d] the protections of these statutory provisions") (citing Honig v. Doe, 484 U.S. 305, 325 (1988)). Indeed, the Supreme Court in Honig accepted the stance of the Department of Education's Office for Civil Rights ("OCR") "that a suspension of up to 10 school-days does not amount to a 'change in placement,'" proscribed by the precursor to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. 484 U.S. at 325 n.8; see also Mason, 2011 WL 89998, at *3; Mills v. Bd. of Educ., 348 F. Supp. 866, 880 (D.D.C. 1972) (recognizing school officials could impose suspensions of short-term, temporary durations and drawing line at "more than two days"). "The OCR, which is charged with enforcing § 504 and Title II, has consistently concluded that a suspension of less than ten days does not constitute 'a significant change in placement' or a denial of a 'free appropriate education' to implicate the protection of these statutes." Mason, 2011 WL 89998, at *3 (first citing OCR Staff Memorandum, 16 IDELR 491 (OCR Nov. 13, 1989); then citing Metro Nashville Pub. Sch., 28 IDELR 887 (OCR Dec. 19, 1997)).

Further, Plaintiff's ADA claim fails because she neglects to describe how her claimed conditions, "a head injury, a migraine condition, an anxiety condition, and a seizure disorder," (Compl. ¶ 356), significantly limit one or more major life activities. See 42 U.S.C. § 12102(1)(A). Because Plaintiff's complaint does not identify any major life activities substantially limited by her alleged impairments, "[w]ithout pleading facts of how [her] major life activities were limited, [Plaintiff] cannot state a sufficient claim . . . under the ADA." Griffin v. Am. Zurich Ins. Co., 697 F. App'x 793, 797 (5th Cir. 2017); see also Lee v. Chi. Transit Auth., 696 F. App'x 752, 753-54 (7th Cir. 2017) (affirming district court's dismissal of ADA claim where plaintiff "merely 'parrot[ed]' the statutory definition of 'disability'" and "failed to allege how [his] conditions substantially limited a major life activity" (first alteration in original)). What Plaintiff has done here - that is, advance "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" - does not suffice. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Plaintiff's claim in Count XI will be dismissed.

C. Plaintiff's State-Law Claims

   1. Supplemental Jurisdiction

As an initial matter, the Court addresses Plaintiff's Motion Requesting this Court To Take Supplemental Jurisdiction of Count V and all State Law Claims and Notice of Voluntary Dismissal of Family Court Appeal (ECF No. 51) ("Motion for Supplemental Jurisdiction"). Plaintiff's Motion for Supplemental Jurisdiction is granted in part and denied in part for the reasons that follow.

Specifically, the Court declines to exercise supplemental jurisdiction with respect to Plaintiff's administrative appeal (Count V) and all state-law claims as they pertain to Defendant McGinley (Counts VI, VII, VIII, and X).

As a general matter, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, even assuming supplemental jurisdiction under § 1367(a), "Section 1367(c) gives a district court discretion to decide whether it should exercise supplemental jurisdiction." Legion Ins. Co. v. Family Serv., Inc., 561 F.

Supp. 2d 232, 239 (D.R.I. 2008). "'In making these decisions, district courts must examine the totality of circumstances,' including considerations of 'comity, judicial economy, convenience, fairness and the like.'" Id. (quoting Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 37 (1st Cir. 2003)).

First, the Court declines to exercise supplemental jurisdiction as to Plaintiff's administrative appeal (Count V). This claim is premised on Rhode Island's Administrative Procedures Act ("APA"), R.I. Gen. Laws § 42-35-15, (see Compl. ¶ 19). However, the APA generally does not permit discovery; instead review is "conducted by the court without a jury and shall be confined to the record." See R.I. Gen. Laws § 42-35-15(f). As a threshold matter, Count V of Plaintiff's complaint, directed solely at Defendants Council and CRSD, is not so related to Plaintiff's other claims to comprise part of the same case or controversy. 28 U.S.C. § 1367(a). Additionally, principles of comity, judicial economy, and fairness counsel against taking supplemental jurisdiction. Legion Ins. Co., 561 F. Supp. 2d at 239. Plaintiff's discrete, no-discovery state-court-administrative appeal of the Council's decision is better heard in state court.

Similarly, the Court is not convinced that it should take supplemental jurisdiction over K.Z.'s claims against Defendant

McGinley simply because they broadly flow from the same originating facts as Plaintiff's claims against the various "school-related" defendants, i.e., the altercation between Plaintiff and Defendant McGinley. The Court is not inclined to find that Plaintiff's purely state-law claims against Defendant McGinley, which solely arise from the events that occurred on October 16, 2015, comprise part of the same constitutional case as Plaintiff's constitutional and state-law claims against all other defendants, which entirely revolve around the way in which these latter defendants responded to the alleged altercation. None of Plaintiff's allegations that relate to what she alleges to be deficient process (i.e., the way in which the various school-related defendants handled and reviewed her one-day in-school suspension) have anything to do with Defendant McGinley (besides, of course, the fact that McGinley participated in the original altercation, which the Court deems insufficient). That Plaintiff brings the same types of state-law claims (i.e., negligence, intentional infliction of emotional distress, and defamation) against both McGinley and the other defendants does not alter that conclusion. § 1367(c) counsels against taking supplemental jurisdiction over these claims; instead, "[t]hey are best brought and decided in state court." Kando v. R.I. Bd. of Elections, 254 F. Supp. 3d 335, 341 (D.R.I. 2017).

The Court reaches the opposite conclusion, however, and retains jurisdiction over Plaintiff's remaining state-law claims as to all other Defendants. The parties all agree that these state-law claims are sufficiently intertwined with Plaintiff's federal constitutional claims. See Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir. 1996) (citing 28 U.S.C. § 1367(c)(3)). Beyond that, these particular claims "arise from the same nucleus of operative facts," concerns for "comity, judicial economy, and fairness" also support exercising supplemental jurisdiction. Id. at 257 (citations omitted). Accordingly, the analysis that follows considers Plaintiff's state-law claims in Counts IV, VII, VIII, IX, and X against the defendants implicated by those claims (except McGinley, as discussed supra).

2. Plaintiff's Remaining State-Law Claims

a. Count IV

On this score, Plaintiff alleges that Defendants[15] breached a duty to act with reasonable care and to not conspire to harm K.Z. by forming "an agreement for a common plan or design to cause financial, physical and emotional harm to Plaintiff[]." (Compl. ¶¶ 277-78.) Without exclusive reliance on it, Plaintiff

---

[15] The Defendants involved in this count are the same as those involved in the 1985(3) claim (Count III).

incorporates by reference the allegations with respect to constitutional civil conspiracy under 42 U.S.C. § 1985. (<u>Id.</u> ¶ 279.) Plaintiff again blames, without identifying, supposed "policies, customs, patterns and practices" in place by Defendants "that were the moving force in harming Plaintiff[]." (<u>Id.</u> ¶ 286.)

This claim fails at its inception. Under well-established Rhode Island law, "[r]ather than an independent source of liability, civil conspiracy is a vehicle for demonstrating joint liability for distinct tortious behavior; and, as such, plaintiff must set forth 'a valid underlying intentional tort theory.'" <u>Bainum v. Coventry Police Dep't</u>, 156 A.3d 418, 421 (R.I. 2017) (quoting <u>Read & Lundy, Inc. v. Washington Trust Co.</u> <u>of Westerly</u>, 840 A.2d 1099, 1102 (R.I. 2004)). And, remarkably, in all the hundreds of pages Plaintiff filed with this Court, she does not identify a specific tort that underlies her conspiracy claim. (<u>See, e.g.</u>, Compl. ¶¶ 276-87; Pls.' Obj. to Chariho Mot. 75-76; Mem. in Supp. of Pls.' Obj. to Def. Jon Anderson's Mot. To Dismiss 79-80); <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61-62 (1998) ("'[I]ntentional torts,' as distinguished from negligent or reckless torts . . . generally require that the actor intend 'the <u>consequences</u> of an act,' not simply 'the act

itself.'" (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964))).

b. Count VII

Plaintiff next alleges the intentional infliction of emotional distress ("IIED") by Defendants Ricci, CRSD, Bridgham, Weber, Attorney Anderson, and Louzon. Plaintiff avers, "Defendants' and their agents' intentional and/or reckless conduct of accusations about Plaintiff K.Z.'s unlawful behavior, assignment of discipline for 'instigating a fight' when the act was an unprovoked assault with Plaintiff K.Z. as the victim with pre-determined discipline, and the outrageous defense of the unjustified discipline through four levels of corrupted appeals" constitutes "extreme and outrageous conduct beyond all bounds of decency and utterly intolerable in a civilized community." (Compl. ¶ 309.) Plaintiff broadly alleges that Defendants caused Plaintiffs "severe emotional distress which manifested itself in physical injury, resulting in damages from the distress, physical discomfort, inconvenience, illness, injury, medical expenses, loss of reputation, and loss of wages." (Id. ¶ 311.)

Plaintiff's allegations do not suffice. IIED requires, inter alia, that the alleged conduct is "extreme and outrageous." See Forbes v. R.I. Bhd. of Corr. Officers, 923 F.

Supp. 315, 329 (D.R.I. 1996) (citing Champlin v. Washington Tr. Co., 478 A.2d 985, 989 (R.I. 1984)). The answer to whether the conduct as alleged is "extreme and outrageous," a question of law, see Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1021 (1st Cir. 1988), is a resounding no. Even if the Court accepts as true the proposition that all Plaintiff did was spray silly string into the air indiscriminately during Spirit Week celebrations, and that she was disciplined with a one-day, in-school suspension, there is no world where this would be considered extreme and outrageous conduct. Instead, "while the conduct complained of may have given offense to plaintiff[] and to other members of [her] community, it would be a far stretch for [the Court] to characterize it as so extreme and outrageous as to be atrocious and utterly intolerable in a civilized community." Swerdlick v. Koch, 721 A.2d 849, 863 (R.I. 1998).[16] Plaintiff's Count VII claim is dismissed.

---

[16] Although the Court disposes of Plaintiff's claim on this narrow ground, it acknowledges that Plaintiff's claim is deficient for several other reasons, including failing to satisfy even Rule 8's low, pleading bar. Indeed, as is more often than not true with Plaintiff's complaint, she merely parrots the elements of IIED without alleging sufficient factual conduct to plausibly allege a cause of action.

c. Counts VIII

On this score, Plaintiff lodges plethora negligence allegations against Defendants Ricci, CRSD, Bridgham, Weber, Louzon, the Committee, and Attorney Anderson. Plaintiff's claim in this respect fails for it cannot demonstrate – even to the standard of mere plausibility – a necessary prerequisite to a negligence claim: causation. See Russian v. Life-Cap Tire Servs., Inc., 608 A.2d 1145, 1147 (R.I. 1992).

Here, twelve of the seventeen allegations devoted to this claim detail various duties that Defendants allegedly owed Plaintiff. (See Compl. ¶¶ 316-27.) The Court need not opine on whether such duties are cognizable, however, because Plaintiff's causation allegations (or lack thereof) are fatal to Count VIII. Indeed, all Plaintiff offers on this score is a conclusory announcement that, "[a]s a direct and proximate result of Defendants' acts and omissions, Plaintiffs were harmed by the breach of the standard of care and suffered the aforesaid damages." (Compl. ¶ 329.) Without belaboring the point, "[n]ot only has Plaintiff failed to plead the element[] . . . with any specific facts, but Plaintiff's [causation] claims are the epitome of conclusory allegations." Picard v. City of Woonsocket, No. 09-318 S, 2010 WL 2134106, at *5 (D.R.I. May 27, 2010). Because Plaintiff has not "nudged [her] claim[]" of

negligence "across the line from conceivable to plausible," it necessarily fails.  <u>Twombly</u>, 550 U.S. at 570.

        d. Count IX

For many of the same reasons outlined in Count VIII, Plaintiff suggests that Defendants Ricci, CRSD, and the Committee breached its duty of care to hire, train, supervise, and retain competent, properly qualified, and well-performing employees, servants, agents and/or contractors at CHS. Plaintiff's Count IX claim resembles Count VIII in a more fundamental way, though:  it, too, does not approach the mark for stating a plausible claim.

Plaintiff's complaint suffers from an express flaw in that it alleges that "Defendants are vicariously responsible and responsible for the acts and omissions of the Defendants' agents under the theory of respondeat superior." (Compl. ¶ 338.)  Yet, under Rhode Island law, "liability for the harmful acts of employees is not premised on the doctrine of respondeat superior, but on a separate affirmative duty owed by the employer . . . ." <u>Liu v. Striuli</u>, 36 F. Supp. 2d 452, 467 (D.R.I. 1999).  Indeed, the Rhode Island Supreme Court has unambiguously pronounced, "[T]he liability of an employer in the negligent supervision or hiring of an unfit employee is an entirely separate and distinct basis from the liability of an

employer under the doctrine of respondeat superior." <u>Mainella v. Staff Builders Indus. Servs., Inc.</u>, 608 A.2d 1141, 1145 (R.I. 1992). As a matter of law, Count IX fails to state a claim.

e. Count X

Here, Plaintiff alleges that "Defendants and their agents published and republished, orally and/or in writing, false statements that Plaintiff K.Z. sprayed Defendant McGinley 'in the face' with silly string, called Defendants McGinley a 'bitch before' spraying silly string, that K.Z. 'instigated a fight,' and that K.Z. committed the crime of 'disorderly conduct,' . . . ." (Compl. ¶ 340.)

Like so many others, Plaintiff's claim for defamation per se does not get off the ground. Defamation per se necessitates that "the false statement must impute to the other: (1) a criminal offense, (2) a loathsome disease, (3) a matter incompatible with his business, trade, profession, or office, or (4) a serious sexual misconduct." <u>Marcil v. Kells</u>, 936 A.2d 208, 212 (R.I. 2007).

As to most of Plaintiff's allegations, the Court's inquiry is straightforward because, as a matter of law, spraying silly string, describing a classmate as a "bitch," and stating that K.Z. "instigated a fight" do not amount to a criminal offense, loathsome disease, business smear, or serious sexual misconduct.

35

<u>Cf.</u> <u>id.</u> at 213. The only remaining factual averment, that Defendants falsely stated K.Z. could be arrested for "disorderly conduct," comes a little closer to alleging a plausible claim. But, even assuming it states a claim,[17] it is barred by the statute of limitations. The only specific allegation the Court can glean from Plaintiff's complaint that references "disorderly conduct" concerns oral communications on October 21, 2015. (<u>See</u> Compl. ¶¶ 138-40.) However, the applicable statute of limitations for slander – one year "after the words are spoken" – precludes such a claim because Plaintiff filed the complaint on June 6, 2017, well beyond one year from October 21. <u>See</u> <u>Francis v. Gallo</u>, 59 A.3d 69, 71 (R.I. 2013) (citing R.I. Gen. Laws § 9-1-14(a)).

Beyond this, Plaintiff's statement that "Defendants and their agents published and republished, orally and/or in writing, false statements" to unnamed "third parties" "innumerable times" is nothing more than "an unadorned, the defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>, 556 U.S. at 678. Plaintiff's "naked assertion[s]" that lack "further factual enhancement" cannot survive. <u>See</u> <u>id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557). Count X is dismissed.

---

[17] The Court is not convinced that a statement that K.Z. engaged in "disorderly conduct" can form the basis for a claim for defamation per se in any event.

IV. Conclusion

This case brings to mind the timeless words of William Shakespeare that "brevity is the soul of wit, [a]nd tediousness the limbs and outward flourishes."[18]  Plaintiff has filed in excess of 500 pages with this Court, much of which has been repetitive and indeed duplicative, forcing the Court to wade through mountains of irrelevant and tedious material in search of some meritorious claim or argument.[19]  Indeed, it is as if counsel for Plaintiff believes that if she buries the Court in paper, it will just give up and kick the can down the road.

Although the Court could venture to discuss the many additional flaws in Plaintiff's pleading, it is mindful of the words of Chief Justice Roberts that, the above-stated reasons are "sufficient ground[s] for deciding this case, and the cardinal principle of judicial restraint — if it is not necessary to decide more, it is necessary not to decide more — counsels us to go no further." PDK Labs. Inc. v. U.S. D.E.A., 362 F.3d 786, 799 (D.C. Cir. 2004).

_____

[18]  William Shakespeare, Hamlet act 2, sc. 2.

[19]  This includes three separate versions of a forty-nine page, 363 paragraph complaint, and 421 pages of memoranda in support of her objections to various motions to dismiss. Throughout her submissions, Plaintiff simply copies and pastes sections of previous responses, or modifies them slightly.

One question remains: whether Plaintiff should be allowed to amend her complaint. The answer is a resounding no. This case, which has been appropriately described as a "teen drama masquerading as a federal lawsuit"[20] has gone on long enough:

> After reviewing the history and dispositions of the prior litigation as well as the pleadings, [and] memoranda . . . in the instant litigation, the Court concludes that providing Plaintiff with an opportunity to amend [her] complaint would be futile. The bottom line is that the Complaint is completely lacking in merit; is filled with inventive and hyperbole, not actionable facts; and has taxed the resources of Defendants and this Court beyond reason. Enough is enough.

Bogosian v. R.I. Airport Corp., No. 17-016 S, 2017 WL 2954536, at *2 (D.R.I. July 11, 2017).[21]

Therefore, the Court GRANTS with prejudice the following motions: RIDE Defendants' Motion To Dismiss (ECF No. 12), Council Defendants' Motion To Dismiss (ECF No. 14), Anderson's Motion To Dismiss (ECF No. 22); and Chariho Defendants' Motion

---

[20] (Mem. in Supp. Def. Anderson Mot. To Dismiss 2.)

[21] The Court notes that certain Defendants have moved for sanctions because of the excessive and arguably frivolous filings of Plaintiff. (Defs.' Ryan Bridgham, Laurie Weber, & Crait Louzon's Mot. for Rule 11 Sanctions, ECF No. 67; Def. Barry Ricci's Mot. for Rule 11 Sanctions Against Pls.' Counsel, Att'y Paige Munro-Delotto, ECF No. 68.) This is a close call. The Court will exercise its discretion and deny those motions, but sternly warns Plaintiff's counsel that she should heed the advice and counsel herein and failure to do so will be addressed appropriately.

To Dismiss (ECF No. 27). To that end, the Court:

(1) DISMISSES with prejudice Plaintiff's federal claims. Count I and II are dismissed as to all Defendants (but McGinley). Count III is dismissed as to Defendants Ricci, CRSD, Bridgham, Weber, Louzon, and Attorney Anderson. Count XI is dismissed as to Defendants CRSD and the Committee.

(2) GRANTS Plaintiff's Motion for Supplemental Jurisdiction (ECF No. 51) over Counts IV, VII, VIII, IX, and X as to all implicated Defendants but McGinley. The Court DISMISSES those claims with prejudice. Counts IV and VII are dismissed as to Defendants Ricci, CRSD, Bridgham, Weber, Louzon, and Attorney Anderson. Count VIII is dismissed as to each of those defendants and the Committee. Count IX is dismissed as to Defendants Ricci, CRSD, and the Committee. And Count X is dismissed as to all Defendants but McGinley.

(3) DENIES Plaintiff's Motion for Supplemental Jurisdiction (ECF No. 51) and declines to exercise jurisdiction over Count V, and Counts VI, VII, VIII, X as to Defendant McGinley. Accordingly, those claims are DISMISSED and Defendant McGinley's Motion To Dismiss (ECF No. 26) is GRANTED without prejudice.

(4)   The Court DENIES Plaintiff's request for leave of court
to amend her Complaint.

(5)   Finally, Defendants Bridgham, Weber, and Louzon's Motion
for Rule 11 Sanctions (ECF No. 67) and Defendant Ricci's
Motion for Rule 11 Sanctions (ECF No. 68) are DENIED.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  March 30, 2018